SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## 62-64 Main Street, L.L.C. and 59-61 Moore Street, L.L.C. v. Mayor and Council of the City of Hackensack; Planning Board of the City of Hackensack (A-19/20-13) (072699)

**Argued October 7, 2014 -- Decided March 23, 2015**

**ALBIN, J., writing for a majority of the Court.**

The issue in this appeal is whether the designation of plaintiffs' properties as part of an area in need of redevelopment under N.J.S.A. 40A:12A-5(a), (b), and (d) of the Local Redevelopment and Housing Law conforms to the Blighted Areas Clause of the New Jersey Constitution.

In 2006, the Hackensack City Council authorized the City's Planning Board to undertake a preliminary investigation to determine whether a two-block area comprised of fourteen individual properties in Hackensack's central business district -- a mix of commercial and residential uses -- should be designated as an area in need of redevelopment.  After eight days of hearings, the Planning Board concluded that five of the fourteen properties were in need of redevelopment, including plaintiffs' two properties on Main and Moore Streets, five lots where a now defunct auto body repair shop had operated.  All five lots are contiguous to one another and are owned by the same individuals through two separate limited liability corporations, each of which is a plaintiff in this case.

In February 2008, the Planning Board adopted a resolution recommending that Lots 4-7 at 62-64 Main Street and Lot 8 at 59-61 Moore Street, along with three other properties comprising six other lots, be designated as an area in need of redevelopment.  The Board determined that Lots 4-7 satisfied the criteria set forth in subsections (a), (b), and (d) of N.J.S.A. 40A:12A-5 for an area in need of redevelopment.  The property met subsection (a) because the two buildings were "substandard and unsafe for occupancy."  The buildings were "boarded up" and displayed "prominent signs of structural deterioration."  Subsection (b) was met because the deteriorated condition of the buildings rendered them vacant and untenantable.  In addition, the adjoining "parking area [was] unsightly and not well maintained."  Last, the property overall "suffer[ed] from faulty arrangement [or] design under" subsection (d).  The Board also determined that Lot 8 satisfied subsection (d) of N.J.S.A. 40A:12A-5 because of its "faulty arrangement [or] design" as evidenced by the "undefined layout and related poor circulation for the parking lot."  The Board noted that the conditions on this lot had "a negative impact on the surrounding properties."  In April 2011, the Mayor and Council adopted the recommendations of the Planning Board designating the plaintiffs' two properties and three others -- eleven lots in all -- as an area in need of redevelopment.

Plaintiffs filed a complaint in lieu of prerogative writs in the Law Division and argued that their properties were improperly classified as in need of redevelopment because they did not meet the constitutional standard for blight set forth in Gallenthin Realty Development, Inc. v. Borough of Paulsboro, 191 N.J. 344 (2007).  The court rejected that argument, reasoning that Gallenthin addressed only an infirmity in subsection (e) of N.J.S.A. 40A:12A-5, and not subsections (a), (b), and (d) on which the Planning Board and the Mayor and Council relied in making their redevelopment designations.  The court also determined that substantial evidence in the record supported the findings of the Planning Board and the Mayor and Council that plaintiffs' properties met the in-need-of-redevelopment criteria of N.J.S.A. 40A:12A-5(a), (b), and (d).

In an unpublished opinion, the Appellate Division reversed, concluding that the Planning Board and the Mayor and Council did not apply the required constitutional standard for blight enunciated in Gallenthin.  That blight standard, according to the Appellate Division, requires a determination that the property suffered from "'deterioration or stagnation that negatively affects surrounding areas,'" (quoting Gallenthin, supra, 191 N.J. at 363).  In the panel's view, only if that constitutional threshold is met can property be designated as in need of redevelopment.  The panel concluded that Gallenthin's definition of blight must necessarily apply to every subsection of the statute, including subsections (a), (b), and (d).

The Supreme Court granted the Planning Board's and the Mayor and Council's petitions for certification. 216 N.J. 7 (2013).

**HELD**: As the Court earlier concluded in Wilson v. City of Long Branch, 27 N.J. 360 (1958), subsections (a), (b), and (d) of N.J.S.A. 40A:12A-5 do not violate the Blighted Areas Clause of the New Jersey Constitution. A determination that an area is blighted and in need of redevelopment does not require a finding that the area "negatively affects surrounding properties," so long as the legislative definitions are met. Substantial evidence in the record supports the Hackensack Planning Board's findings -- later adopted by the Mayor and Council -- that Lots 4-7 at 62-64 Main Street and Lot 8 at 59-61 Moore Street were part of an area in need of redevelopment.

1. The New Jersey Constitution provides that "[p]rivate property shall not be taken for public use without just compensation." N.J. Const. art. I, ¶ 20 (Eminent Domain Clause) (emphasis added). One such public use is the redevelopment of blighted areas. N.J. Const. art. VIII, § 3, ¶ 1 (Blighted Areas Clause). The Blighted Areas Clause is an affirmative grant of authority to municipal and public entities to rehabilitate and revitalize areas that have decayed into a state of blight. Gallenthin, supra, 191 N.J. at 359. Although the Constitution does not define blight, redevelopment laws enacted in the years immediately before the 1947 Constitutional Convention defined the term and allowed for the taking of private property for slum clearance and other purposes. The Redevelopment Companies Law in 1944 defined "blighted areas" as those "areas of municipalities . . . [where] there exist substandard conditions and [un]sanitary housing conditions owing to obsolescence, deterioration and dilapidation of buildings, or excessive land coverage, lack of planning, of public facilities, of sufficient light, air and space, and improper design and arrangement of living quarters." L. 1944, c. 169, § 2. The Blighted Areas Clause was intended to remove any doubt about the constitutionality of that enactment. (pp. 16-19)

2. Shortly after the ratification of the Blighted Areas Clause, the Legislature passed the Blighted Areas Act, L. 1949, c. 187. According to the 1949 Act, a "blighted area" included "[b]uildings and structures which have economically deteriorated and where there is a disproportion between the cost of municipal services rendered to the area as compared with the tax revenue derived therefrom." L. 1949, c. 187, § 1(c). In 1951, the Legislature amended the definitions of "blighted area" in the Blighted Areas Act. In 1992, the Legislature replaced the Blighted Areas Act with the Local Housing and Redevelopment Law (Redevelopment Law), L. 1992, c. 79. The Redevelopment Law substituted the term "area in need of redevelopment" for the pejorative term "blighted area" used in the repealed 1951 statute. The definitions of "blighted area" contained in the 1951 Blighted Areas Act are almost identical to those contained in the Redevelopment Law at subsections (a), (b), and (d) of N.J.S.A. 40A:12A-5. The structure of subsection (e), however, unlike subsections (a), (b), and (d), underwent a significant change. The 1992 Redevelopment Law empowered a municipality to declare property blighted in a way never authorized before -- merely because the property was not put to its optimal use. That was the constitutional issue that the Court addressed in Gallenthin. (pp. 19-25)

3. In Gallenthin, the Court concluded that an "interpretation of N.J.S.A. 40A:12A-5(e), which would equate 'blighted areas' to areas that are not operated in an optimal manner, cannot be reconciled with the New Jersey Constitution." Gallenthin, supra, 191 N.J. at 365. Although "deterioration or stagnation that negatively affects surrounding properties," id. at 360, describes blight, and perhaps most cases of blight, it does not describe every possible form of blight. The Court has never stated that an area is not blighted unless it "negatively affects surrounding properties" because, to do so, would undo all of the legislative classifications of blight established before and after the ratification of the Blighted Areas Clause -- classifications that the Court has previously declared to be constitutional. In Gallenthin, the only issue before the Court was the constitutionality of subsection (e) of the Redevelopment Law, not the constitutionality of subsections (a), (b), or (d). Gallenthin did not establish a constitutional blight standard to be superimposed on top of the legislative classification of blight. (pp. 25-31)

4. The Blighted Areas Clause must coexist with individual rights enshrined in the State Constitution, such as rights protected by the Eminent Domain Clause, which ensures that property will not be taken without just compensation. Redevelopment may not occur at the expense of individual rights. Planning boards and governing bodies are reminded that they have an obligation to rigorously comply with the statutory criteria for determining whether an area is in need of redevelopment. So long as the blight determination is supported by substantial evidence in the record, a court is bound to affirm that determination. (pp. 31-37)

5. Substantial evidence in the record supports the Hackensack Planning Board's findings -- later adopted by the Mayor and Council -- that Lots 4-8 were part of an area in need of redevelopment. Even if the parking area designated as Lot 8, standing alone, did not meet the definition of blight, it still might be properly categorized as part of an area in need of redevelopment. Blight determinations are not viewed in a piecemeal fashion. (pp. 37-44)

The judgment of the Appellate Division is **REVERSED**.

**CHIEF JUSTICE RABNER** filed a separate, **dissenting** opinion, in which **JUSTICE SOLOMON** joins, stating that the majority has taken a step backward from Gallenthin. The Chief Justice would hold that when the government designates an area to be "in need of redevelopment," it must prove that the property is in fact "blighted" by demonstrating, through substantial evidence in the record, both components of blight established in Gallenthin: (1) "deterioration or stagnation" that (2) "negatively affects surrounding properties."

**JUSTICES LaVECCHIA and FERNANDEZ-VINA join in JUSTICE ALBIN's opinion. CHIEF JUSTICE RABNER filed a separate, dissenting opinion, in which JUSTICE SOLOMON joins. JUSTICE PATTERSON and JUDGE CUFF (temporarily assigned) did not participate.**

62-64 MAIN STREET, L.L.C. and
59-61 MOORE STREET, L.L.C.,

    Plaintiffs-Respondents,

        v.

MAYOR AND COUNCIL OF THE CITY
OF HACKENSACK; PLANNING BOARD
OF THE CITY OF HACKENSACK,

    Defendants-Appellants.


        Argued October 7, 2014 – Decided March 23, 2015

        On certification to the Superior Court,
        Appellate Division.

        Joseph P. Kreoll argued the cause for
        appellant Planning Board of the City of
        Hackensack (Law Offices of Richard
        Malagiere, attorney).

        Thomas P. Scrivo argued the cause for
        appellant Mayor and Council of the City of
        Hackensack (McElroy, Deutsch, Mulvaney &
        Carpenter, attorneys; John P. Michalski and
        Robert J. Hitscherich, on the briefs).

        Peter Dickson argued the cause for
        respondents (Potter & Dickson, attorneys;
        Mr. Dickson and Michael J. Monaghan, III, on
        the briefs).

        David G. Evans submitted a brief on behalf
        of amici curiae Pacific Legal Foundation,
        National Federation of Independent Business,
        Institute for Justice, and Ilya Somin.


    JUSTICE ALBIN delivered the opinion of the Court.

    The New Jersey Constitution grants municipalities the

authority to revitalize decaying and disintegrating residential, commercial, and industrial areas.  Our Constitution states that the "redevelopment of blighted areas" is a "public purpose" and that private property may be taken to achieve that end, N.J. Const. art. VIII, § 3, ¶ 1, provided that owners are awarded just compensation for their property, N.J. Const. art. I, ¶ 20. The evident goal of Article VIII, Section 3, Paragraph 1 (Blighted Areas Clause) is to give municipalities the means to improve the quality of life of their residents and to spur business opportunity and job growth.  To implement this constitutional mandate, the Legislature initially passed the Blighted Areas Act, L. 1949, c. 187 (codified as amended at N.J.S.A. 40:55-21.1 to -21.14 (repealed 1992)), and later the Local Redevelopment and Housing Law (Redevelopment Law), L. 1992, c. 79 (codified as amended at N.J.S.A. 40A:12A-1 to -73). The Redevelopment Law defines when an area is blighted and therefore "in need of redevelopment."  N.J.S.A. 40A:12A-5.

Plaintiffs own five lots in the City of Hackensack on which stood two dilapidated buildings abutted by two poorly maintained and decrepit parking lots.  Hackensack designated eleven out of twenty lots in a two-block area as in need of redevelopment, including plaintiffs' five lots.  In doing so, the Planning Board made specific findings that those lots met the statutory definitions of blight in N.J.S.A. 40A:12A-5(a), (b), and (d).

2

The Hackensack Mayor and Council passed a resolution that adopted the Planning Board's findings.

Plaintiffs filed an action in lieu of prerogative writs in Superior Court, challenging Hackensack's classification of their lots as blighted. Plaintiffs argued that a finding of blight under N.J.S.A. 40A:12A-5(a), (b), and (d) of the Redevelopment Law does not meet the constitutional definition of blight enunciated in Gallenthin Realty Development, Inc. v. Borough of Paulsboro, 191 N.J. 344, 373 (2007). On that basis, plaintiffs sought to strike down the Mayor and Council's resolution classifying plaintiffs' properties as part of an area in need of redevelopment.

The trial court rejected plaintiffs' argument, concluding that Gallenthin merely corrected a constitutional defect in subsection (e) of N.J.S.A. 40A:12A-5 and did not sweepingly render other subsections of the Redevelopment Law constitutionally infirm. The trial court, moreover, determined that substantial evidence supported Hackensack's classification of plaintiffs' properties as in need of redevelopment.

The Appellate Division reversed, holding that Gallenthin established a heightened constitutional standard for blight applicable to every subsection of the Redevelopment Law. According to the Appellate Division, Gallenthin superimposes over the statutory definition of blight the need for an

3

additional finding that property has suffered a "'deterioration or stagnation that negatively affects surrounding areas,'" (quoting Gallenthin, supra, 191 N.J. at 363).

We now hold that the Appellate Division has over-read the scope of Gallenthin, which only addressed a specific constitutional defect in subsection (e) of N.J.S.A. 40A:12A-5. In Gallenthin, we simply determined that subsection (e), which defined blight as the nonproductive use of property, did not meet the constitutional standard for blight set forth in the Blighted Areas Clause, N.J. Const. art. VIII, § 3, ¶ 1. We did not suggest in Gallenthin that the definitions of blight in subsections (a), (b), and (d) of N.J.S.A. 40A:12A-5, which have been part of legislative schemes for more than sixty years, were constitutionally inadequate. Indeed, we upheld the constitutionality of the provisions at issue in Wilson v. City of Long Branch, 27 N.J. 360, 378-82 (1958), and Levin v. Township Committee of Bridgewater, 57 N.J. 506, 510-15 (1971) -- decisions referred to approvingly in Gallenthin.

Applying the required deferential standard of review to the municipal decision-making in this case, we agree with the trial court that substantial evidence supported Hackensack's designation of plaintiffs' properties as in need of redevelopment. We therefore reverse the Appellate Division.

I.

4

A.

In 2006, the Hackensack City Council authorized the City's Planning Board to undertake a preliminary investigation to determine whether a two-block area in Hackensack's central business district -- a mix of commercial and residential uses -- should be designated as an area in need of redevelopment. See N.J.S.A. 40A:12A-6(a). The targeted two-block area is comprised of fourteen individual properties.

In eight days of hearings between December 2006 and January 2008, the Planning Board took testimony from five witnesses and received evidence, including expert reports and photographs, concerning whether to recommend the two-block area as in need of redevelopment. Ultimately, the Planning Board concluded that five of the fourteen properties were in need of redevelopment, including two properties on Main and Moore Streets acquired by plaintiffs in 1999. Plaintiffs' two properties encompass five lots, where a now defunct auto body repair shop had operated. All five lots are contiguous to one another and are owned by the same individuals through two separate limited liability corporations, each of which is a plaintiff in this case.

Plaintiff 62-64 Main Street, L.L.C., owns Block 205, Lots 4, 5, 6, and 7, a 10,443 square-foot parcel of land, on which sat -- at the time of the hearings -- two vacant, boarded up, dilapidated buildings with crumbling masonry, which were

5

formerly part of the auto repair business.[1]  Behind the buildings is a poorly maintained, partly paved and partly gravel parking lot.

Plaintiff 59-61 Moore Street, L.L.C., owns Block 205, Lot 8, a 4280 square-foot parcel of land on which formerly sat an auto garage, which had been demolished.  Currently, the property is used as a paved parking lot, although there are no markings for individual parking spaces, and the pavement is in a deteriorated condition.  The parking lot has no landscaping or lighting and encroaches onto the sidewalk.

Plaintiffs intended to build a bank on the five lots, but could not secure site-plan approval from the City's Planning Board or the necessary variances from the City's Board of Adjustment to go forward with their proposals.  The denials from those Boards are not at issue in this appeal.  Suffice it to say, plaintiffs have treated all five lots as one property for development purposes.

The principal witness for the Planning Board was Janice Talley, a licensed professional planner with H2M Group, the firm retained by the Board to prepare a redevelopment study of the area under investigation.  According to Talley and the redevelopment report she authored, the buildings on Lots 4-7

---

[1] While this matter was on appeal, the roof to one of the buildings collapsed.  The building was then torn down.

were vacant, dilapidated, and "boarded up due to their unsafe condition." The exterior of the buildings showed "prominent signs of structural deterioration." Notably, plaintiffs refused to give Talley access to make an assessment of the buildings' interior conditions. Talley described the parking lot behind the two buildings as "poorly surfaced" and without lines, lighting, or other necessary improvements.

Talley testified that the decrepit state of the buildings created "unwholesome" living and working conditions and that the buildings were "a detriment to the . . . safety, health and welfare of the community." Talley concluded that Lots 4-7 met the criteria of N.J.S.A. 40A:12A-5(a), (b), and (d) for an area in need of redevelopment.

Talley also testified that the current parking area on Lot 8, where the automotive garage once stood, was "crumbling" and "in disrepair." The parking area, she noted, had no defined layout, no lighting, no landscaping, and encroached onto the sidewalk. That encroachment -- the lack of separation between the parking area and the sidewalk -- posed a threat to pedestrians and rendered it a public-safety danger, in Talley's view. She concluded that Lot 8 met the criteria of N.J.S.A. 40A:12A-5(d) for an area in need of redevelopment.

Plaintiffs' expert, Peter Steck, a licensed planner, testified that Lots 4-8 did not satisfy the criteria for an area

7

in need of redevelopment.  He explained that the buildings were boarded up and therefore did not pose a danger.  According to Steck, the property was in a state of transition, and the buildings were structurally sound, although vacant at the time.  He insisted that the condition of Lots 4-8 did not retard the development of properties nearby, such as a new drug store, an automotive parts store, a bank, and a nail salon.  Steck maintained that the buildings were not detrimental to the neighborhood and that the unpaved parking areas were similar to others in the neighborhood.  He also noted that plaintiffs were appealing the denial of their application to construct a bank on the five lots.[2]

In Steck's opinion, plaintiffs' property should not be considered in need of redevelopment simply because the City desires taller buildings in the area, and that the Board should have taken into account the time it takes to secure the necessary approvals to rehabilitate the property.

B.

In February 2008, the Planning Board adopted a resolution recommending that Lots 4-7 at 62-64 Main Street and Lot 8 at 59-

---

[2] In June 2008, the Appellate Division affirmed the Superior Court's determination that the Planning Board had not abused its discretion in denying the necessary approvals for construction of a bank on the property.  The Board's denial was based on traffic concerns and lack of adequate parking spaces.

61 Moore Street, along with three other properties comprising six other lots, be designated as an area in need of redevelopment.[3]  By a vote, the Board members found Talley's testimony more credible than Steck's.

The Board determined that Lots 4-7 satisfied the criteria set forth in subsections (a), (b), and (d) of N.J.S.A. 40A:12A-5 for an area in need of redevelopment.  The property met subsection (a) because the two buildings were "substandard and unsafe for occupancy."  The buildings were "boarded up" and displayed "prominent signs of structural deterioration," resulting in the City issuing plaintiff 62-64 Main Street a citation to either "demolish the buildings or correct [the] unsafe conditions."  Subsection (b) was met because the deteriorated condition of the buildings rendered them vacant and untenantable.  In addition, the adjoining "parking area [was] unsightly and not well maintained."  Last, the property overall "suffer[ed] from faulty arrangement [or] design under" subsection (d).

The Board also determined that Lot 8 satisfied subsection (d) of N.J.S.A. 40A:12A-5 because of its "faulty arrangement [or] design" as evidenced by the "undefined layout and related

_____

[3] Nine properties comprising nine lots within the two-block study area did not meet the statutory criteria for an area in need of redevelopment.  In all, eleven lots were deemed part of a blighted area.

9

poor circulation for the parking lot." The Board noted that the conditions on this lot had "a negative impact on the surrounding properties because it is an unsightly area and the inefficient utilization of the parking area contributes to greater use of the on-street parking resources than would otherwise occur."

In April 2011, the Mayor and Council adopted the recommendations of the Planning Board designating the plaintiffs' two properties and three others -- eleven lots in all -- as an area in need of redevelopment.[4]

C.

Plaintiffs filed a complaint in lieu of prerogative writs in the Law Division, challenging the Mayor and Council's designation of their properties as part of an area in need of redevelopment. Plaintiffs argued that their properties were improperly classified as in need of redevelopment because they did not meet the constitutional standard for blight set forth in Gallenthin. The court rejected that argument, reasoning that Gallenthin addressed only an infirmity in subsection (e) of N.J.S.A. 40A:12A-5, and not subsections (a), (b), and (d) on which the Planning Board and the Mayor and Council relied in

---

[4] The Mayor and Council had passed an earlier resolution adopting the Planning Board's recommendations, but that resolution was withdrawn because of litigation, which challenged, among other things, whether the Mayor and Council failed to comply with the Open Public Meetings Act, N.J.S.A. 10:4-6 to -21. Issues relating to this first resolution are not part of this appeal.

10

making their redevelopment designations. The court also determined that substantial evidence in the record supported the findings of the Planning Board and the Mayor and Council that plaintiffs' properties met the in-need-of-redevelopment criteria of N.J.S.A. 40A:12A-5(a), (b), and (d).

D.

In an unpublished opinion, the Appellate Division reversed, concluding that the Planning Board and the Mayor and Council did not apply the required constitutional standard for blight enunciated in Gallenthin. That blight standard, according to the Appellate Division, requires a determination that the property suffered from "'deterioration or stagnation that negatively affects surrounding areas,'" (quoting Gallenthin, supra, 191 N.J. at 363). In the panel's view, only if that constitutional threshold is met can property be designated as in need of redevelopment. Although the appellate panel acknowledged that Gallenthin addressed only subsection (e) of N.J.S.A. 40A:12A-5, it reasoned that Gallenthin's definition of blight must necessarily apply to every subsection of the statute, including subsections (a), (b), and (d). Thus, the panel held that Gallenthin's constitutional standard must be satisfied, in addition to the Redevelopment Law's criteria, before a municipality can designate property as in need of redevelopment.

11

The panel also suggested that the Planning Board erred in classifying Lot 8 as an area in need of redevelopment. The panel recognized that the parking lot lacked "lighting and landscaping that led to over-utilization of street parking," and was hindered by "a faulty layout and crumbling surface." Nevertheless, it believed that improvements to the lot would have eliminated the "negative impact on the community." In addition, the panel faulted the Board for not addressing "the fact that the owners had attempted to obtain approval to develop the properties, and that the proposals were denied."

In short, the panel maintained that the Planning Board and the Mayor and Council did not apply the constitutionally mandated standard and that the Board's factual findings did not meet that standard.

## E.

We granted the Planning Board's and the Mayor and Council's petitions for certification. 62-64 Main St., L.L.C. v. Mayor & Council of Hackensack, 216 N.J. 7 (2013). We also granted the motion of the Pacific Legal Foundation, the National Federation of Independent Business, the Institute for Justice, and Ilya Somin -- three non-profit advocacy groups and a private legal scholar -- to submit a joint brief and participate as amici curiae.

## II.

A.

The Planning Board and the Mayor and Council present substantially similar positions in support of reversing the Appellate Division. They argue that the Appellate Division gave an "overly broad interpretation" of Gallenthin. They submit that Gallenthin declared only subsection (e) of N.J.S.A. 40A:12A-5 constitutionally defective because subsection (e), unlike other subsections of that statute, "permitted a redevelopment designation in cases where a property was merely being underutilized." The Planning Board and the Mayor and Council maintain that the descriptions of blight in subsections (a), (b), and (d) of N.J.S.A. 40A:12A-5 conform with the Blighted Areas Clause of our State Constitution. Thus, they claim that the Appellate Division erred in construing Gallenthin as requiring a finding of blight in addition to the findings mandated by subsections (a), (b), and (d). Last, the Planning Board and the Mayor and Council contend that the Appellate Division did not pay deference to the Board's findings, which should have been upheld because substantial evidence in the record supported them.

B.

Plaintiffs ask this Court to affirm the Appellate Division and declare that property may not be designated as in need of redevelopment unless the property meets both the constitutional

13

standard defining blight enunciated in Gallenthin and the statutory requirements imposed by N.J.S.A. 40A:12A-5. According to plaintiffs, Gallenthin's blight analysis was intended not only to address the constitutional shortcomings of subsection (e), but also those of the statute's other subsections. They contend that some subsections of N.J.S.A. 40A:12A-5 "plainly do not describe anything akin to 'blighted,'" and that despite the Planning Board's "cherry-picking of convenient phrases" from subsections (a), (b), and (d) to declare their property "in need of redevelopment," the Board's findings still fell short of the constitutional definition of blight.

Plaintiffs also argue that the Law Division "failed to rule on the city's designation of the area as opposed to plaintiffs' properties," pointing out that the City "did not find that blighted properties 'predominated' in the area" or that those properties established the area's "'general character.'"

C.

Amici, the Pacific Legal Foundation, the National Federation of Independent Business, the Institute for Justice, and Ilya Somin, acknowledge that "Gallenthin was resolved by construing only subsection 5(e) of the Redevelopment Law in light of the Blighted Areas Clause," but nevertheless urge this Court to apply its reasoning to each subsection of N.J.S.A. 40A:12A-5. Amici insist that "[e]ach of the subsections

14

identify conditions which may, in a particular case, indicate that an area is blighted but will not always satisfy the Blighted Areas Clause's requirements." According to amici, property is only constitutionally blighted under the Clause where "'deterioration or stagnation . . . negatively affects surrounding properties,'" (quoting Gallenthin, supra, 191 N.J. at 360). Amici catalogue cases that they claim exemplify the misuse of the eminent domain power to redevelop non-blighted areas that were home to the poor and minorities for the purpose of yielding greater economic value. Amici believe that without meaningful judicial scrutiny, the political branches will expansively apply the designation of blight "to encompass merely unattractive property or land that falls below political leaders' desired level of productivity."

### III.

The essential issue is whether the designation of plaintiffs' properties as part of an area in need of redevelopment, pursuant to N.J.S.A. 40A:12A-5(a), (b), and (d), conforms to the Blighted Areas Clause of the New Jersey Constitution. To resolve that issue, we must examine the text, origin, and purpose of the Blighted Areas Clause; legislative enactments following adoption of the Blighted Areas Clause; and our jurisprudence that has construed both the Clause and the Redevelopment Law and its predecessor statutes.

15

A.

The New Jersey Constitution provides that "[p]rivate property shall not be taken for public use without just compensation." N.J. Const. art. I, ¶ 20 (emphasis added). Although the Constitution does not catalogue the wide array of public uses for which property may be taken, it does identify one such public use -- the redevelopment of blighted areas. N.J. Const. art. VIII, § 3, ¶ 1. The Blighted Areas Clause of our State Constitution is an affirmative grant of authority to municipal and public entities to rehabilitate and revitalize areas that have decayed into a state of blight. Gallenthin, supra, 191 N.J. at 359.

The Blighted Areas Clause, in relevant part, states: "The clearance, replanning, development or redevelopment of blighted areas shall be a public purpose and public use, for which private property may be taken or acquired. Municipal, public or private corporations may be authorized by law to undertake such clearance, replanning, development or redevelopment . . . ." N.J. Const. art. VIII, § 3, ¶ 1. The limiting principle of this provision is that an area must be "blighted" before it may be taken for redevelopment purposes. The Constitution does not define blight. Therefore, we must inquire into the drafters' understanding of the meaning of blight at the time of the ratification of the 1947 New Jersey Constitution. See DePascale

16

v. State, 211 N.J. 40, 48-50 (2012) (explaining that framers' understanding of constitutional provision was informed by history leading up to adoption of that provision).

The drafters of the Blighted Areas Clause were not writing on a blank slate.  Redevelopment laws enacted in the years immediately before the 1947 Constitutional Convention defined the term "blight" and allowed for the taking of private property for slum clearance and other purposes.  Urban Redevelopment Law, L. 1946, c. 52; Redevelopment Companies Law, L. 1944, c. 169. "The proceedings of the constitutional convention indicate that [the Blighted Areas Clause] was adopted to remove any doubts with regard to earlier pertinent legislation such as the Redevelopment Companies Law and the Urban Redevelopment Law." McClintock v. City of Trenton, 47 N.J. 102, 105 (1966) (internal citations omitted) (citing to Proceedings of the New Jersey Constitutional Convention of 1947, vol. 1 at 742-44); see Gallenthin, supra, 191 N.J. at 361 (noting that fear that then existing redevelopment legislation might "be declared unconstitutional" prompted ratification of Blighted Areas Clause).

Therefore, we may fairly conclude that delegates who ratified the Blighted Areas Clause understood the term blight in the manner in which it was used in contemporaneous legislation, such as the Redevelopment Companies Law, L. 1944, c. 169.  See

17

Lloyd v. Vermeulen, 22 N.J. 200, 210 (1956) ("We recognize fully that resort may be had to contemporaneous and practical constructions for whatever aid they may fairly afford in ascertaining the true sense and meaning of constitutional and statutory provisions."). The Redevelopment Companies Law in 1944 defined "blighted areas" as those "areas of municipalities . . . [where] there exist substandard conditions and [un]sanitary housing conditions owing to obsolescence, deterioration and dilapidation of buildings, or excessive land coverage, lack of planning, of public facilities, of sufficient light, air and space, and improper design and arrangement of living quarters." L. 1944, c. 169, § 2; see Gallenthin, supra, 191 N.J. at 361 (quoting Redevelopment Companies Law's definition of "blighted areas"); see also Urban Redevelopment Law, L. 1946, c. 52 (providing for "acquisition by municipalities of land areas" where there is "congested, dilapidated, substandard, unsanitary and dangerous housing conditions and excessive land coverage"). Indeed, "the [B]lighted [A]reas [C]lause could reasonably be understood as a constitutional sanction of [the Redevelopment Companies Law and the Urban Redevelopment Law]." James R. Zazzali & Jonathan L. Marshfield, Providing Meaningful Judicial Review of Municipal Redevelopment Designations: Redevelopment in New Jersey Before and After Gallenthin Realty Development, Inc. v. Borough of

18

Paulsboro, 40 Rutgers L.J. 451, 474-75 (2009).

B.

Shortly after the ratification of the Constitution's Blighted Areas Clause, the Legislature passed the Blighted Areas Act, L. 1949, c. 187, the predecessor to the current Redevelopment Law. The Legislature broadly defined "blighted area." According to the 1949 Act, a "blighted area" included "[b]uildings and structures which have economically deteriorated and where there is a disproportion between the cost of municipal services rendered to the area as compared with the tax revenue derived therefrom." L. 1949, c. 187, § 1(c).

In 1951, the Legislature amended the definitions of "blighted area" in the Blighted Areas Act. L. 1951, c. 248, § 1. Then, in 1992, the Legislature replaced the Blighted Areas Act with the Local Housing and Redevelopment Law (Redevelopment Law), L. 1992, c. 79, in part to "codify, simplify and concentrate prior enactments" into the new law, N.J.S.A. 40A:12A-2(d). The Redevelopment Law substituted the term "area in need of redevelopment" for the pejorative term "blighted area" used in the repealed 1951 statute. N.J.S.A. 40A:12A-3 ("'[A]rea in need of redevelopment' means an area . . . determined heretofore to be a 'blighted area.'").

The definitions of "blighted area" contained in the 1951 Blighted Areas Act at subsections (a), (b), and (d) of N.J.S.A.

19

40:55-21.1 (repealed) are almost identical to those contained in our present Redevelopment Law at subsections (a), (b), and (d) of N.J.S.A. 40A:12A-5.  Indeed, a comparison of those two statutes reveals that the textual differences in the subsection (a), (b), and (d) definitions for "blight" and "area in need of redevelopment" are minor in nature.  See Forbes v. Bd. of Trs. of S. Orange Vill., 312 N.J. Super. 519, 526 (App. Div.), certif. denied, 156 N.J. 411 (1998) (noting that subsections (a), (b), and (d) of Blighted Areas Act and Redevelopment Law are "virtually identical" in terms of "their structure and verbiage").

The differences between subsections (a), (b), and (d) of the Blighted Areas Act and the current Redevelopment Law are delineated below.  Words and punctuation that have a strike-through were present in the 1951 Blighted Areas Act and are deleted from our current Redevelopment Law, whereas words and punctuation that are underscored are additions to the Redevelopment Law.  Today's Redevelopment Law provides that a municipality's governing body may declare "an area in need of redevelopment" when it finds the following conditions:

> (a) The generality of buildings ~~used as dwellings or the dwelling accommodations therein~~ are substandard, unsafe, ~~in~~unsanitary, dilapidated, or obsolescent, or possess any of such characteristics, or are so lacking in light, air, or space, as to be conducive to unwholesome living or working

20

conditions~~;~~.

(b) The discontinuance of the use of buildings previously used for <u>commercial,</u> manufacturing<u>,</u> or industrial purposes~~,~~<u>;</u> the abandonment of such buildings<u>;</u> or the same being allowed to fall into so great a state of disrepair as to be untenantable~~;~~.

. . .

(d) Ares ~~(including slum areas),~~ with buildings or improvements which<u>,</u> by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community~~;~~.

[<u>Compare</u> <u>N.J.S.A.</u> 40:55-21.1(a), (b), (d), <u>with</u> <u>N.J.S.A.</u> 40A:12A-5(a), (b), (d).]

The minor definitional changes in subsections (a), (b), and (d) are important to our analysis because we have upheld the constitutionality of those definitions of "blighted area" contained in the Blighted Areas Act. See <u>Forbes</u>, <u>supra</u>, 312 <u>N.J. Super.</u> at 528-29 (stating that Legislature's 1951 "multi-faceted definition of blight . . . has not been successfully challenged on the basis of constitutional non-conformance, overstatement or over-breadth"). In <u>Forbes</u>, Judge Pressler observed that the definition of blight in the Blighted Areas Act "clearly constituted and came to constitute a community consensus and expressed a common understanding of what is meant

21

by blight subject to public remediation." Ibid. (citing Wilson, supra, 27 N.J. at 370).

In Wilson, supra, we upheld the constitutionality of the legislative classifications of blight for the then five subsections of the Blighted Areas Act, including (a), (b), and (d), which plaintiffs challenge in this appeal. 27 N.J. at 378-82. We determined that our State Constitution, through the Blighted Areas Clause, gave "specific approval and authorization of redevelopment projects." Id. at 372. In the process of validating the constitutionality of the 1951 Blighted Areas Act, we made the following observation:

> Community redevelopment is a modern facet of municipal government. Soundly planned redevelopment can make the difference between continued stagnation and decline and a resurgence of healthy growth. It provides the means of removing the decadent effect of slums and blight on neighboring property values, of opening up new areas for residence and industry. In recent years, recognition has grown that governing bodies must either plan for the development or redevelopment of urban areas or permit them to become more congested, deteriorated, obsolescent, unhealthy, stagnant, inefficient and costly.
>
> [Id. at 370.]

In Wilson, we found that, for constitutional purposes, the five subsections of the Blighted Areas Act "define 'blighted area' with substantial exactitude and confine the municipal decision to those limits." Id. at 378. We concluded that the

22

legislative descriptions of blight sufficiently channeled the exercise of municipal authority, while acknowledging that "'the exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power.'" Ibid. (quoting Ward v. Scott, 11 N.J. 117, 123 (1952)). We noted that "[t]he area to be classed as blighted is the portion of a municipality which in the judgment of the planning board or governing body, as the case may be, reasonably falls within the definition laid down by the Legislature." Id. at 379 (emphasis added). We also noted that the designation of a "blighted area" might necessarily include "some sound homes or buildings" to accomplish the redevelopment plan because it is the redevelopment of an area, not a particular structure, that is the statutory objective. Id. at 379-81. We rejected the argument that the absence of a definition for the term "blighted" in our State Constitution meant that "the authority" to define blight "resides in the judicial and not the legislative branch of the government." Id. at 381. As we pointed out, the Blighted Areas Clause authorized the passage of legislation empowering municipal governments to undertake redevelopment. Id. at 382-83. Although undoubtedly "the Judiciary is the final arbiter of the institutional commissions articulated in the Constitution," Gallenthin, supra, 191 N.J. at

23

358, we clearly held in Wilson that the Legislature did not exceed its commission in enacting the Blighted Areas Act.

In 1971, in Levin, supra, the Court addressed whether vacant, unimproved land "was properly the subject of a declaration of blight under subsection (e)" of the Blighted Areas Act. 57 N.J. at 515-16. In doing so, we reaffirmed the validity of the five subsections of the Blighted Areas Act, including (a), (b), and (d). Id. at 510. Levin focused entirely on the application of subsection (e) to the record in that case.

Although subsection (e) is not at issue in the appeal before us, a brief discussion of subsection (e) in Levin is important to an understanding of Gallenthin, where our sole focus was subsection (e). Subsection (e) at the time of Levin provided that blight exists when there is

> "A growing or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein and other conditions, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare."
>
> [Ibid. (quoting N.J.S.A. 40:55-21.1(e)) (emphasis added).]

We stressed in Levin that "the Legislature intended by means of (e) to encourage the proper and sound growth of suburban and rural land, particularly open areas which because of the

24

conditions described therein were <u>stagnant and unproductive</u>."
<u>Id.</u> at 515 (emphasis added). We upheld the declaration of
blight under subsection (e) to the land at issue in <u>Levin</u>. <u>Id.</u>
at 539.

The structure of subsection (e), unlike subsections (a),
(b), and (d), underwent a significant change with passage of the
Redevelopment Law in 1992. Whereas subsection (e) of the
Blighted Areas Act, <u>L.</u> 1951, <u>c.</u> 248, § 1(e), permitted a finding
of blight only if property were "stagnant <u>and</u> unproductive,"
(emphasis added), subsection (e) of the 1992 Redevelopment Law,
<u>L.</u> 1992, <u>c.</u> 79, § 5(e), permitted a finding that property was
"in need of redevelopment" if it were "stagnant <u>or</u> not fully
productive," (emphasis added). By altering the conjunctive to
the disjunctive in subsection (e), the 1992 Redevelopment Law
empowered a municipality's governing body to declare property
blighted in a way never authorized before -- merely because the
property was not put to its optimal use.

That was the constitutional issue that we addressed in
<u>Gallenthin</u>.

C.

In <u>Gallenthin</u>, <u>supra</u>, the Borough of Paulsboro classified a
sixty-three-acre parcel of vacant wetlands as "in need of
redevelopment" under <u>N.J.S.A.</u> 40A:12A-5(e). 191 <u>N.J.</u> at 348.
The municipality based that determination solely on a finding

25

that the land's unimproved condition rendered it "not fully productive." Ibid. Paulsboro believed that it was entitled to make such a classification based on the then language of N.J.S.A. 40A:12A-5(e), which stated that property qualified as an area in need of redevelopment if it were "stagnant or not fully productive," L. 1992, c. 79, § 5(e). Id. at 357.[5] As earlier noted, the 1992 Redevelopment Law's version of subsection (e) was materially different from the subsection (e) iteration in the Blighted Areas Act, N.J.S.A. 40:55-21.1(e), which we had found to be constitutionally sound in Levin, supra, 57 N.J. at 511-15 and Wilson, supra, 27 N.J. at 378-82.

We concluded that subsection (e) of the Redevelopment Law

---

[5] Following our decision in Gallenthin, the Legislature amended subsection (e) to read:

> A growing lack or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real properties therein or other similar conditions which impede land assemblage or discourage the undertaking of improvements, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare, which condition is presumed to be having a negative social or economic impact or otherwise being detrimental to the safety, health, morals, or welfare of the surrounding area or the community in general.
>
> [L. 2013, c. 159, § 1 (emphasis added).]

26

violated the Blighted Areas Clause because it allowed a declaration of blight to apply to any property that is "'not fully productive' yet potentially valuable for 'contributing to and serving' the general welfare." Gallenthin, supra, 191 N.J. at 365. We observed that "[u]nder that approach, any property that is operated in a less than optimal manner is arguably 'blighted'" and that "[i]f such an all-encompassing definition of 'blight' were adopted, most property in the State would be eligible for redevelopment." Ibid. Thus, we held in Gallenthin that an "interpretation of N.J.S.A. 40A:12A-5(e), which would equate 'blighted areas' to areas that are not operated in an optimal manner, cannot be reconciled with the New Jersey Constitution." Ibid.

We did not presume in Gallenthin to craft a precise standard for the metes and bounds of the Blighted Areas Clause. See id. at 365 ("We need not examine every shade of gray coloring a concept as elusive as 'blight' to conclude that the term's meaning cannot extend as far as Paulsboro contends."). We noted that in Wilson we had concluded that the Blighted Areas Act's "definition of blight was within the bounds of the Constitution," id. at 362-63 (citing Wilson, supra, 27 N.J. at 382), and that in Levin we had upheld the validity of the Act's definitions of blight, id. at 363 (citing Levin, supra, 57 N.J. at 511-16).

27

After favorably discussing Wilson and Levin, we remarked:
"Although the meaning of 'blight' has evolved, the term retains
its essential characteristic:  deterioration or stagnation that
negatively affects surrounding properties."  Ibid.
From that passage and another -- "[a]t its core, 'blight'
includes deterioration or stagnation that has a decadent effect
on surrounding property," id. at 365 -- plaintiffs argue that we
created an overarching constitutional standard in Gallenthin for
defining blight.  By those comments, we intended nothing more
than descriptions of blight -- not a one-size-fits-all
definition of blight.  Had we intended otherwise, we would have
repudiated Wilson and Levin, which upheld the classifications of
blight in subsections (a), (b), and (d) that are challenged in
this appeal.  That we did not do.  Instead, we observed
approvingly that in Wilson "we upheld the constitutionality of
the Blighted Areas Act's (BAA) progressive definition of
'blight.'"  Id. at 362.

To be clear, although "deterioration or stagnation that
negatively affects surrounding properties," id. at 360,
describes blight, and perhaps most cases of blight, it does not
describe every form of possible blight.  For example, we did not
mean by those words that an isolated slum, such as a dilapidated
housing project with dangerous conditions that posed an
immediate threat to the health and safety of its residents,

28

would not be a blighted area under a subsection of N.J.S.A. 40A:12A-5 merely because it did not negatively affect surrounding properties.  Nor have we ever suggested that a crumbling and abandoned toxic industrial site, removed by distance from other properties, would not fit the statutory definition of blight.[6]  We have never stated that an area is not blighted unless it "negatively affects surrounding properties" because, to do so, would undo all of the legislative classifications of blight established before and after the ratification of the Blighted Areas Clause -- classifications that we have previously declared to be constitutional.

Additionally, we made clear from the opening statement in Gallenthin that the only issue before the Court was the constitutionality of subsection (e) of the Redevelopment Law: "Because the New Jersey Constitution authorizes government redevelopment of only 'blighted areas,' we conclude that the Legislature did not intend N.J.S.A. 40A:12A-5(e) to apply in

---

[6] If the dissent is correct that these hypothetical properties would negatively affect surrounding properties -- no matter how distant, then it stands to reason that the decrepit, tumble-down buildings on 62-64 Main Street certainly negatively affected properties next door and across the street.  That would suggest that the legislative classifications in N.J.S.A. 40A:12A-5(a), (b), and (d) will lead in most, if not all, cases to the redevelopment of properties that adversely affect surrounding properties.

29

circumstances where the sole basis for redevelopment is that the property is 'not fully productive.'" Id. at 348. The constitutionality of subsections (a), (b), and (d) was never at issue in Gallenthin. There, we never expressed doubt about Wilson's validation of those subsections.

Last, had we intended to create a new, far-reaching constitutional standard for blight, we certainly would have said so in our holding in Gallenthin. We concluded Gallenthin by declaring: "N.J.S.A. 40A:12A-5(e) applies only to property that has become stagnant and unproductive because of issues of title, diversity of ownership, or other conditions of the same kind." Id. at 373 (emphasis added). We simply rendered the statute constitutional by replacing the "or" with an "and." Had we adopted a new constitutional construct in Gallenthin -- as plaintiffs and the Appellate Division believe -- we would have ended the opinion differently, perhaps by stating that subsection (e) "applies only to property that has become stagnant and unproductive and that negatively affects surrounding properties."

We therefore reject the notion that Gallenthin established a constitutional blight standard to be superimposed on top of the legislative classifications of blight. To the extent that our language in Gallenthin has created any misunderstanding, we now make explicit that we did not intend to create a

constitutional blight standard that rendered unconstitutional the classifications of blight we upheld in Wilson and Levin.

D.

The dissent's jurisprudential approach would require this Court to declare unconstitutional subsections (a), (b), and (d) of N.J.S.A. 40A:12A-5 in its present form, and in every prior legislative iteration since before and after the 1947 New Jersey Constitution.  It would require this Court to find that redevelopment projects that have helped rebuild Newark, Jersey City, New Brunswick, and other urban centers were the product of unconstitutional statutes and reliance on prior misguided decisions of this Court, such as Wilson and Levin.  If we had intended in Gallenthin to undo the entire carefully crafted framework of our redevelopment laws, as the dissent concludes, we would have said so directly.  We would not have concentrated in Gallenthin on the infirmity in subsection (e) -- a single defective timber -- if the whole statutory scheme was rotten.

If the dissent's view were to prevail and this Court were to repudiate its holding in Wilson and strike down subsections (a), (b), and (d), countless redevelopment projects up and down this state might be halted and mired in litigation.  See Chester R. Ostrowski, Comment, A "Blighted Area" of the Law:  Why Eminent Domain Legislation Is Still Necessary in New Jersey After Gallenthin, 39 Seton Hall L. Rev. 225, 228-29 (2009)

31

(identifying almost one thousand redevelopment projects, including thirty in Jersey City, ongoing in June 2005). Planning boards, municipal bodies, and courts would have to apply the dissent's newly minted constitutional standard as a substitute for the long-standing legislative definitions on which they have relied for more than sixty years. The dissent's interpretation of subsections (a), (b), and (d) would have dire implications and perhaps lead to a state of chaos for ongoing redevelopment projects.

The drafters of the 1947 Constitution understood the enormous benefits afforded by redevelopment. Their foresight has been realized by the redevelopment projects that have helped raise some urban centers literally from the ashes. Those projects have spurred the opening of new businesses and the construction of new housing for low- and moderate-income citizens in our state. Robert S. Goldsmith & Robert Beckelman, What Will Happen to Redevelopment in New Jersey when the Economy Recovers? 36 Rutgers L. Rec. 314, 327 (2009) (describing successful redevelopment projects in Jersey City, Newark, Trenton, and Perth Amboy).

The redevelopment of decaying neighborhoods was the objective of the drafters of the Blighted Areas Clause. That Clause must coexist with individual rights enshrined in our State Constitution, such as rights protected by the Eminent

Domain Clause, N.J. Const. art. I, ¶ 20, which ensures that property will not be taken without just compensation.[7] Redevelopment may not occur at the expense of individual rights. Our courts will continue to protect individual rights of landowners, as they have done before and since our decision in Wilson.

E.

As is clear, plaintiffs are seeking a declaration from this Court that the descriptions of blight in subsections (a), (b), and (d) of the Redevelopment Law do not adequately define blight consistent with the Blighted Areas Clause of our State Constitution. However, the Redevelopment Law, like all statutes, is entitled to a "strong presumption of constitutionality that . . . can be rebutted only upon a showing that the statute's 'repugnancy to the Constitution is clear beyond a reasonable doubt.'" Hamilton Amusement Ctr. v.

---

[7] The Eminent Domain Act provides a number of protections to a landowner before property can be taken by the government. Hous. Auth. of New Brunswick v. Suydam Investors, L.L.C., 177 N.J. 2, 14 (2003). Before filing a declaration of taking, a public entity is required to engage in "bona fide negotiations" with the owner to acquire the property. N.J.S.A. 20:3-6. If the negotiations are unsuccessful, the public entity can file a condemnation action, and the court then appoints three commissioners to set compensation based on the fair market value of the property. N.J.S.A. 20:3-12(b). The landowner can reject the commissioners' award and request that a jury hear testimony and award just compensation for the taking of the property. N.J.S.A. 20:3-13(b).

Verniero, 156 N.J. 254, 285 (1998) (quoting Harvey v. Bd. of Chosen Freeholders, 30 N.J. 381, 388 (1959)), cert. denied, 527 U.S. 1021, 119 S. Ct. 2365, 144 L. Ed. 2d 770 (1999). Plaintiffs' challenge to subsections (a), (b), and (d) are not new. As previously discussed, we upheld the constitutionality of those subsections in Wilson and reaffirmed their validity in Levin. Plaintiffs' constitutional challenge is premised on the belief that we had established in Gallenthin an overarching constitutional standard for defining blight under the Blighted Areas Clause. That belief is mistaken. In Gallenthin, we did not impugn our decisions in Wilson and Levin. We have no reason to reconsider the constitutionality of subsections (a), (b), and (d) in light of the facts before us.

IV.

A.

Having resolved the constitutional issue, we remind planning boards and governing bodies that they have an obligation to rigorously comply with the statutory criteria for determining whether an area is in need of redevelopment. A finding that an area is in need of redevelopment will have significant consequences for the property owner. Gallenthin, supra, 191 N.J. at 373. "In general, a municipality must establish a record that contains more than a bland recitation of applicable statutory criteria and a declaration that those

34

criteria are met." Ibid. A resolution adopted by a planning board or governing body should clearly articulate the factual findings that support the statutory criteria for designating an area as in need of redevelopment. It disserves the municipality and the parties to go through lengthy hearings, with the presentation of multiple witnesses and volumes of evidence, only to have the process jeopardized because of a poorly crafted resolution.

We must be mindful, however, that after the municipal authorities have rendered a decision that an area is in need of redevelopment, that decision is "invested with a presumption of validity." Levin, supra, 57 N.J. at 537. "Judicial review of a blight determination" must be informed by an understanding "of the salutary social and economic policy" advanced by redevelopment statutes. Ibid. So long as the blight determination is supported by substantial evidence in the record, a court is bound to affirm that determination. Gallenthin, supra, 191 N.J. at 372-73 (citing N.J.S.A. 40A:12A-6(b)(5)). That said, the discretion exercised by municipal authorities "is not unfettered." Levin, supra, 57 N.J. at 537. Judicial deference does not mean that a court is a rubber stamp. A blight determination based on a net opinion or insubstantial evidence cannot stand. Gallenthin, supra, 191 N.J. at 372-73.

In reviewing the validity of the blight declaration in this

case, we must remember that plaintiffs treated 62-64 Main Street and 59-61 Moore Street -- five contiguous lots -- as one property for development purposes.  The issue is not whether one isolated lot might have some redeeming features, but whether an "area" is in need of redevelopment.  Levin, supra, 57 N.J. at 539.  For example, where an area in need of redevelopment encompasses a large residential or industrial/commercial area, a municipality may "draw within a blighted area certain houses or buildings which are in good condition" because, to do otherwise, "would be in some instances to defeat the overall legislative purpose, namely, the redevelopment of blighted areas."  Wilson, supra, 27 N.J. at 381; see also Gallenthin, supra, 191 N.J. at 372 ("[N]on-blighted parcels may be included in a redevelopment plan if necessary for rehabilitation of a larger blighted area."); Levin, supra, 57 N.J. at 539 ("The fact that single parcels in the area are useful and could not be declared blighted if considered in isolation is basis neither for excluding such parcels nor for invalidating the designation.").  Nothing in the Blighted Areas Clause or the Redevelopment Law suggests that an area in need of redevelopment must meet some minimum size requirement.  Maglies v. Planning Bd. of E. Brunswick, 173 N.J. Super. 419, 422 (App. Div.) (finding blight "even though confined to a relatively small area"), certif. denied, 84 N.J. 462 (1980); see also Wilson, supra, 27 N.J. at

36

379 (noting that "courts will not interfere with the boundary lines adopted in the absence of palpable abuse of discretion").

B.

We now must assess whether the Hackensack Planning Board and the Mayor and Council properly designated plaintiffs' properties as part of an area in need of redevelopment. More particularly we must decide whether Hackensack's blight determination, based on the statutory criteria in N.J.S.A. 40A:12A-5, is supported by substantial evidence in the record.[8] As described earlier, the statutory criteria for blight include buildings that are "substandard," "unsafe," "dilapidated," or "obsolescent," N.J.S.A. 40A:12A-5(a); buildings no longer in use for commercial or industrial purposes, abandoned buildings, and buildings that have fallen "into so great a state of disrepair as to be untenantable," N.J.S.A. 40A:12A-5(b); and "[a]reas with

---

[8] The dissent does not give Hackensack the benefit of the deferential standard of review that applies to municipal designations of blight. The Planning Board credited certain testimony over other testimony. Making credibility determinations was within the purview of the Board. Our role is to see whether the evidence in the record -- in this case, the hearings before the Planning Board -- support the findings made by the municipality. The issue is solely whether there is substantial evidence to support Hackensack's designations, not whether we would have come to a different decision if we were the Planning Board or Mayor and Council. See Lyons v. City of Camden, 52 N.J. 89, 98 (1968) (stating that if blight determination is "supported by substantial evidence, the fact that the question is debatable does not justify substitution of the judicial judgment for that of the local legislators").

37

buildings or improvements which, by reason of . . . faulty arrangement or design . . . are detrimental to the safety, health, morals, or welfare of the community," N.J.S.A. 40A:12A-5(d).

At the redevelopment proceedings, the Planning Board reviewed reports, inspected photographs, and received testimony at eight days of hearings. It credited the report and testimony of a professional planner, Janice Talley, who examined the properties at issue.

### 62-64 Main Street -- Lots 4-7

On Lots 4-7 sat two vacant, boarded up, dilapidated buildings with crumbling masonry -- the vestiges of a defunct auto repair business. Plaintiffs denied Talley access to the interior of the buildings. Nevertheless, the buildings' exteriors showed "prominent signs of structural deterioration" and were evidently in a dangerous condition, leading Talley to conclude that the buildings were "a detriment to the . . . safety, health and welfare of the community." Indeed, the roof to one of the buildings collapsed during the appeal of this case, requiring the building to be torn down.[9] Behind the two

---

[9] While it is true that, as the dissent notes, the roof had not collapsed by the time of the Planning Board hearings, the dire condition of the property was fully described at the hearings. The fact is that the building had to be torn down and anyone observing the property today can see that one of the boarded up

38

buildings was a "poorly surfaced" parking lot that did not have lines, lighting, or other necessary improvements.

The Planning Board determined that the decrepit buildings and their decayed parking lot satisfied the criteria for an area in need of redevelopment, focusing on subsections (a), (b), and (d) of N.J.S.A. 40A:12A-5. The Board adopted a resolution that explained its findings: the buildings were vacant, in a deteriorated condition, "substandard and unsafe for occupancy," and untenantable, thus meeting the blight criteria for subsections (a) and (b). Moreover, the entirety of the property, including the parking lot, suffered from a faulty arrangement or design under subsection (d).

We hold that substantial evidence in the record supports the Planning Board's findings -- later adopted by the Mayor and Council -- that Lots 4-7 were part of an area in need of redevelopment. We cannot look separately at the parking lot, which was an integral part of the property, in assessing whether it fits under subsection (d). This is the very type of parsing that Wilson, supra, cautions against in reviewing whether a municipality properly exercised its authority in designating an area in need of redevelopment. 27 N.J. at 379-81.

59-61 Moore Street -- Lot 8

buildings is missing, a point related to the Court during oral argument.

39

This lot was part of the former auto repair business that encompassed Lots 4-7. An auto garage that once sat on Lot 8 was demolished. The ruins of that property were converted into a parking lot, although one that had no markings for individual parking spaces, no lighting, and no landscaping. The pavement of the parking lot was crumbling and in disrepair and encroached onto the sidewalk. The lack of any visible separation between the parking lot and sidewalk created a public-safety hazard, according to Talley.

In its resolution, the Planning Board determined that the lot's unsightliness and its inefficient use of the parking area -- evidenced by its undefined layout -- contributed to a greater demand for on-street parking, thereby having "a negative impact on surrounding properties." The Mayor and Council adopted the Board's finding that Lot 8 met the definition of blight under subsection (d) because of its "faulty arrangement [or] design." We hold that substantial evidence in the record supports that finding.

Even if Lot 8, standing alone, did not meet the definition of blight, it still might be properly categorized as part of an area in need of redevelopment. Blight determinations are not viewed in a piecemeal fashion. Levin, supra, 57 N.J. at 539. The Planning Board's expert testified that Lot 8 could not be redeveloped on its own, and that it could only be redeveloped in

conjunction with its neighboring lots.  Lot 8 was one of five lots on which an auto repair business operated, and plaintiffs treated Lot 8 as one of five combined lots for development purposes.  Thus, the historical and contemplated use of Lots 4-8 was for a single business purpose.

We cannot agree with the Appellate Division that the Planning Board erred by not addressing "the fact that the owners had attempted to obtain approval to develop the properties, and that the proposals were denied."  A landowner's desire to develop property "does not militate against [a] blight declaration."  Levin, supra, 57 N.J. at 540.  Here, the municipal authorities concluded that the property was unsuitable for the construction of a bank.  Plaintiffs unsuccessfully appealed their failed efforts to secure the municipal construction approvals for a bank.  In short, plaintiffs' failure to develop the property in accordance with the lawful requirements imposed by Hackensack land-use authorities cannot obscure the reality that the property remains in a state of blight.[10]

---

[10] The dissent seems to draw a nefarious inference from the fact that Hackensack did not give approval to plaintiffs' flawed proposals to develop their properties.  However, the trial court reviewed and upheld the decision of the relevant municipal boards, and the Appellate Division affirmed.  Those decisions are not subject to collateral attack here.  There is no basis to question the good faith of Hackensack in making those earlier land-use determinations.

It bears mentioning that, under N.J.S.A. 40A:12A-8(j), plaintiffs are free to pursue an agreement with Hackensack that would permit them to rehabilitate their property in a way consistent with the redevelopment plan. See N.J.S.A. 40A:12A-8(j); see also William M. Cox & Stuart R. Koenig, New Jersey Zoning & Land Use Administration, § 38-7.2 at 953 (2014) (stating that "statute encourages property owners to voluntarily repair and rehabilitate buildings and associated improvements to bring them up to current standards usually accomplished through an agreement with the governing body or redevelopment entity"). Even if Hackensack and plaintiffs did not reach an agreement that would permit either plaintiffs to rehabilitate the property or Hackensack to purchase the property, plaintiffs are still entitled to all of the protections of the Eminent Domain Act of 1971, N.J.S.A. 20:3-1 to 20:3-50. In the end, plaintiffs are entitled to "just compensation" -- the fair market value of their property -- if Hackensack pursues a taking through its eminent domain power. See N.J. Const. art. I, ¶ 20; N.J.S.A. 20:3-38 ("The value of any land or other property being acquired in connection with development or redevelopment of a blighted area shall be no less than the value as of the date of the declaration of blight by the governing body upon a report by a planning board.").

V.

42

This is not the case of a municipality invoking the redevelopment laws to declare property blighted solely because the property -- on which a residence stands or a commercial business operates -- is not put to its optimal use. We do not have here, for example, a pristine set of Cape Cod homes fronting the ocean, which a municipality wants to remove to build high rises in order to increase its taxable base. This also is not a case about a municipality driving poor or minority residents out of a well-maintained older neighborhood for gentrification purposes. Rather, we have here the more mundane scenario envisioned by the drafters of the Blighted Areas Clause, an area in the downtown section of a city, which meets some of the classic statutory definitions of blight -- dilapidated and vacant buildings, and unsightly and rundown properties that pose safety hazards.

For sure, the abuse of the redevelopment laws cannot be countenanced. Although a municipality's blight determination is entitled to judicial deference, courts still must be vigilant to ensure that there is compliance with the Redevelopment Law. But we cannot forget that the "Blighted Areas Clause [has] enabled municipalities to intervene, stop further economic degradation, and provide incentives for private investment." Gallenthin, supra, 191 N.J. at 362. Nor can we forget that the Redevelopment Law promotes a "salutary social and economic

43

policy," Levin, supra, 57 N.J. at 537, a policy that gives municipalities the authority to rehabilitate and revitalize blighted areas for the benefit of the public -- a benefit realized through better housing and enhanced business and employment opportunities.

VI.

For the reasons expressed, we reverse the judgment of the Appellate Division. We affirm the Law Division's holding that substantial evidence in the record supports the Hackensack Planning Board's and the Mayor and Council's designations of plaintiffs' properties as part of an area in need of redevelopment.

JUSTICES LaVECCHIA and FERNANDEZ-VINA join in JUSTICE ALBIN's opinion. CHIEF JUSTICE RABNER filed a separate, dissenting opinion, in which JUSTICE SOLOMON joins. JUSTICE PATTERSON and JUDGE CUFF (temporarily assigned) did not participate.

62-64 MAIN STREET, L.L.C. and
59-61 MOORE STREET, L.L.C.,

    Plaintiffs-Respondents,

        v.

MAYOR AND COUNCIL OF THE CITY
OF HACKENSACK; PLANNING BOARD
OF THE CITY OF HACKENSACK,

    Defendants-Appellants.


    CHIEF JUSTICE RABNER, dissenting.

    One of our most prized liberties is the right to possess and protect property free from governmental interference.  That right is so fundamental that it appears in the first sentence of the State Constitution:  "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of . . . acquiring, possessing, and protecting property."  N.J. Const. art. I, ¶ 1.

    In certain limited, carefully prescribed circumstances, a governmental body may seek to take a person's private property for a public purpose.  For example, when done properly, towns can redevelop deteriorated areas in a way that halts further decay and enhances the life of the community.  But before local or state officials can use that authority and take private

1

property, they must satisfy a number of important requirements. Among other things, if they seek to redevelop a "blighted" area, they must abide by another constitutional command and prove that the property is in fact "blighted." N.J. Const. art. VIII, § 3, ¶ 1.

In a significant ruling in 2007, Gallenthin Realty Development, Inc. v. Borough of Paulsboro, this Court analyzed the meaning of the term "blighted" in the State Constitution. 191 N.J. 344 (2007). The Court unanimously held that the essential components of blight are (1) "deterioration or stagnation" that (2) "negatively affects surrounding properties." Id. at 363. The Court then applied that concept to a different section of the statute that is now before us, the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -73 ("LRHL"). The Court held that the clause in question, N.J.S.A. 40A:12A-5(e), could not be reconciled with the Constitution. Gallenthin, supra, 191 N.J. at 365.

Today, the majority takes a step backward from Gallenthin. In assessing different sections of the same law, N.J.S.A. 40A:12A-5(a), (b), and (d), the majority concludes that when the government designates an area to be "in need of redevelopment" -- a critical step in the takings process -- it need not affirmatively prove both elements set forth in Gallenthin to show that a property is "blighted." Instead, the majority

2

permits the designation of private land for redevelopment even when government officials have not shown a decadent effect on surrounding properties.

The majority goes on to affirm the designation of two private properties in this case as "in need of redevelopment" based on the conclusory findings of the Hackensack Planning Board, which the Mayor and City Council adopted. That designation paves the way for the City to take the properties from their rightful owners.

When the government seeks to take a citizen's private property for redevelopment, it must act with the utmost care. And it must make its case through substantial evidence in the record. N.J.S.A. 40A:12A-6(b)(5)(c). To satisfy the commands of the Constitution, the government must show that the property it seeks to take is blighted. Because the majority's approach falls short of that imperative, I respectfully dissent.

I.

A.

This case involves two adjacent pieces of property in a commercial area of downtown Hackensack. The first parcel, located at 62-64 Main Street, encompasses 10,443 square feet of space or roughly one-quarter of one acre. In 2008, there were two vacant, boarded-up, masonry buildings and a gravel parking area on the property. The front portion of one building was two

3

stories; the rear portion and the second building were single-story.  The tax map lists the property as Lots 4 to 7 on Block 205.

The second parcel, located at 59-61 Moore Street (also known as Church Street), is a single rectangular lot that covers 4,280 square feet or about one-tenth of one acre.  The property is used as a parking lot.  It is paved but poorly surfaced, has no landscaping or lighting, and is not marked for individual spaces or aisles.  In one area, the lot encroaches onto the sidewalk.  The parcel is listed as Lot 8, Block 205.

Both properties are owned by limited liability companies with the same three members, Michael J. Monaghan, Frank Callahan, and Danny Callahan.  The parties acquired the properties in 1999 from an old auto body shop.  At the time, the owners demolished a building on the Moore Street property.  They also decommissioned the Main Street property.  With an eye toward redeveloping the property, they spent $20,000 to strip the interior of the building and remove the electrical and plumbing work.  To address environmental issues, the owners also spent $60,000 to remediate the properties.  Overall, according to the record, the owners represent that they have invested "hundreds of thousands of dollars into improving the property." Taxes on both properties have been fully paid.

In recent years, the owners made a number of efforts to redevelop the properties.  In 1999, they engaged in discussions with state officials about leasing space to two state agencies; met with an official at the local building department who approved a zoning switch from auto repair to office space; and then abandoned the effort after a meeting with the Mayor who, according to Monaghan, did not favor the project.

In 2006, the Planning Board denied an application to demolish the structures at 62-64 Main Street and replace them with a branch of the Bank of New York and a drive-through teller lane.  The Board's decision, which was upheld in court, focused primarily on parking, traffic flow, and congestion issues.

Again in 2011, the City declined permission to build a branch of PNC Bank with parking and a drive-through lane at the Main Street site.  The Board of Adjustment cited traffic and parking concerns, among other reasons, when it denied the request for a variance and site plan approval.

The downtown area near the properties has seen other development in recent years.  CVS, Commerce Bank (now TD Bank), and Auto Zone have all built new facilities in the area.

B.

At the same time the owners pursued redevelopment plans for their properties, the City proceeded on a course to take both parcels.  The Mayor and the City Council passed a resolution in

5

July 2006, which authorized the Planning Board to conduct a preliminary investigation of a two-block area -- that included the two properties -- as a potential site for redevelopment. The Planning Board, in turn, hired H2M Group, an architectural, engineering, and planning firm, to conduct a study. In the following years, the firm prepared two redevelopment studies and a separate addendum to report its findings.

The first report, issued in October 2006, was authored by Janice Talley and Michael Pessolano. It examined twelve properties in the study area and found that each of them met two or more criteria in the LRHL which qualified the properties for designation as an area in need of redevelopment.

The first study concluded that the Main Street property met five criteria for redevelopment, N.J.S.A. 40A:12A-5(a), (b), (d), (e), and (h). (The statute is detailed in section III below.) The report noted that the property, along with the Moore Street parcel, was the subject of an unsuccessful attempt to construct a new bank in 2006. In addition, H2M observed that the two buildings at 62-64 Main Street showed "prominent signs of structural deterioration," had "no plaster on significant portions of the facade," were boarded up and "vacant due to deteriorated conditions" that "rendered them untenantable," were unsafe, unhealthy, and unsightly, suffered from "faulty arrangement of design," and were "economically underutilized."

6

The study also noted a code enforcement citation for the property, which the owners had challenged. With regard to subsection (d), the report stated that the Main Street parcel has a negative effect on surrounding properties.

The first study also found that the parking lot at Moore Street met three criteria for redevelopment, N.J.S.A. 40A:12A-5(d), (e), and (h). H2M stated that the property displayed "faulty arrangement of design," had no landscaping or lighting, encroached into the sidewalk along one street, and was "economically underutilized." In addition, the report found that the parcel had "a negative impact on the surrounding properties" because it was unsightly and inefficient, in a way that contributed to greater use of on-street parking.

After a hearing before the Planning Board in December 2006, which involved extensive questions of Mr. Pessolano, H2M submitted a revised Redevelopment Study dated May 15, 2007. The new report assessed the same study area but regrouped the lots as fourteen properties. This time, H2M found that only eight properties qualified under the LRHL for designation as an area in need of redevelopment.

The new version had some additional information -- including the results of several interior inspections -- but was quite similar overall to the first study. (The report noted that the owners did not grant permission to inspect the interior

of the Main Street property.)  The analysis of the Main and Moore Street parcels remained the same with one exception:  the report no longer found that any properties should be designated as in need of redevelopment based on N.J.S.A. 40A:12A-5(h) ("The designation of the delineated area is consistent with smart growth planning principles adopted pursuant to law or regulation.").

Ms. Talley submitted an Addendum to the second Redevelopment Study on September 26, 2007.  The Addendum responded to a recent property revaluation in Hackensack and the Court's decision in Gallenthin.  Based on Gallenthin, the Addendum concluded that the properties no longer met the criterion for redevelopment under N.J.S.A. 40A:12A-5(e).  As a result, according to H2M, the Main Street property now qualified as an area in need of redevelopment under only three sections of the LRHL, N.J.S.A. 40A:12A-5(a), (b), and (d), and the Moore Street parking lot now qualified under only one section, N.J.S.A. 40A:12A-5(d).

The Planning Board held public hearings on eight days from December 13, 2006 to January 24, 2008.  During the hearings, planners testified for both sides.  Monaghan also testified about the history of the properties.

During the course of the hearings, Mr. Pessolano, an author of the first study and a planner retained by Hackensack,

8

conceded that he had not considered whether property values had increased, declined, or remained the same in the potential redevelopment area; whether any properties had been foreclosed upon or sold through tax sales; whether people were actively buying or selling property in the area and the prices of any properties sold; or whether properties were in arrears for non-payment of taxes, among other related factors. Although the redevelopment studies highlighted parking, circulation, and traffic concerns at multiple points, Mr. Pessolano also testified that no parking study was done of the area, no parking inventory had been done, and traffic accidents in the area had not been reviewed.

Ms. Talley, who worked on both studies and the addendum for the Planning Board, testified as well. Among other things, she stated that the parking lot at Moore Street met the criteria for redevelopment under the LRHL. She also agreed, under cross-examination, that with a few improvements, the property would not meet the criteria; some landscaping, striping, and exterior lighting could better define the parking area and separate it from the sidewalk, so that the parcel would no longer be "in need of redevelopment."

Peter Steck, a community planning consultant retained by the owners, submitted a report and testified as well. He

maintained that the properties did not qualify for designation under the LRHL as areas in need of redevelopment.

On February 13, 2008, the Planning Board adopted a resolution that designated five properties -- including 62-64 Main Street and 59-61 Moore Street -- as areas in need of redevelopment. It found that nine other properties did not qualify. The resolution referenced the studies and testimony at the hearing, without further comment, and contained brief findings of fact and conclusions of law for the properties, which are reviewed below.

The Mayor and City Council passed Resolution No. 272-08 on August 5, 2008, which accepted and adopted the recommendations of the Planning Board. For reasons that are not relevant to this appeal, the governing body withdrew the resolution and, on April 5, 2011, adopted Resolution No. 159-11 (Resolution), which again accepted the Planning Board's recommendations.

C.

Plaintiffs 62-64 Main Street, L.L.C., and 59-61 Main Street, L.L.C., filed a complaint in lieu of prerogative writs on May 18, 2011 to challenge the Resolution. They sought a declaration that the designated properties were not an area in need of redevelopment.

The trial court affirmed the Resolution. The court rejected the owners' interpretation of Gallenthin, supra, and

10

held that "the term 'blight' does not apply to each of the LRHL's statutory criteria." The trial judge concluded that Hackensack had not acted arbitrarily, capriciously, or unreasonably and found substantial evidence in the record to support the designation of each property.

The Appellate Division reversed. In an unpublished opinion, the panel observed that "Gallenthin established a heightened standard for designating an area in need of redevelopment, requiring not only a determination that an area satisfies a subsection under N.J.S.A. 40A:12A-5, but also a finding of blight." In light of Gallenthin, that finding was necessary to satisfy the State Constitution. Thus, although the Court in Gallenthin addressed only subsection (e) of the LRHL, the panel reasoned that "Gallenthin's holding applies to every subsection of N.J.S.A. 40A:12A-5."

As applied to this case, the panel noted, "[i]t is also clear that neither the Board nor the Mayor and Council considered whether the conditions noted in the Board's resolution rose to the level of blight." In addition, the Appellate Division found that the resolutions "provide[d] insufficient findings to support their conclusions." The panel therefore reversed Hackensack's designations under the LRHL.

11

II.

A.

The government's taking of private property is an extraordinary event.  As this Court has cautioned, "[t]he condemnation process involves the exercise of one of the most awesome powers of government."  City of Atl. City v. Cynwyd Invs., 148 N.J. 55, 73 (1997) (discussing Eminent Domain Act).  The same is true for the redevelopment process.  The immense authority that municipalities have to designate areas in need of redevelopment and ultimately take private property for that purpose can serve as "a valuable tool" to reverse the effects of "economic deterioration."  Gallenthin, supra, 191 N.J. at 365.  But that power, of course, can also be abused.  In either case, use of the government's authority has lasting, serious consequences for owners of private property -- not all of whom have the means to challenge official actions and try to protect homes and businesses they have lived in and operated for years.

The State Constitution therefore places important limits on the State's power to take -- and seek to take -- private property.  As this Court expounded upon in Gallenthin, the Constitution requires the State to pay "just compensation" for property taken by eminent domain.  Id. at 356; N.J. Const. art. I, ¶ 20.  The Constitution also guarantees that no one can be "deprived of property without due process of law."  Gallenthin,

12

supra, 191 N.J. at 356 (citing Twp. of W. Orange v. 769 Assocs., 172 N.J. 564, 572 (2002)).  In addition, government may only take property for a "public use."  N.J. Const. art. I, ¶ 20.

Article VIII, Section 3, Paragraph 1 of the Constitution, referred to as the Blighted Areas Clause, expands on that requirement.  It states that "[t]he clearance, replanning, development or redevelopment of blighted areas shall be a public purpose and public use, for which private property may be taken or acquired."

To guard against governmental abuse of power, the United States Constitution has similar protections.  As Justice Brandeis wrote more than seventy-five years ago, the federal Constitution requires a "justifying public purpose" and the payment of just compensation before the government may take private property under its eminent domain authority.  Thompson v. Consol. Gas Util. Corp., 300 U.S. 55, 80, 57 S. Ct. 364, 376, 81 L. Ed. 510, 524 (1937) (citations omitted).  The guarantee of due process before the government may take private property is equally well-settled.  See Ochoa v. Hernandez y Morales, 230 U.S. 139, 161, 33 S. Ct. 1033, 1041, 57 L. Ed. 1427, 1437 (1913).  In light of those state and federal constitutional protections, any legislation to redevelop and take private property must strike the right balance between serving a public purpose and protecting individual property rights.

Based on the authority of the Blighted Areas Clause, the Legislature enacted the LRHL and its predecessor, the Blighted Areas Act, N.J.S.A. 40:55-21.1 to -21.14 (repealed by L. 1992, c. 79, § 59), which empowered government officials to designate areas as blighted or in need of redevelopment. Gallenthin, supra, 191 N.J. at 357, 362; see also N.J.S.A. 40A:12A-6(c). To be sure, the Clause granted the Legislature, and state and local governments in turn, only the authority "allowed by [the] State Constitution." Gallenthin, supra, 191 N.J. at 359. For that reason, the entirety of the LRHL, and not just a single subsection, derives its authority from the Blighted Areas Clause and must comply with it. In that way, the Clause "operates as both a grant and limit on the State's redevelopment authority." Ibid. And those twin purposes enable government both to redevelop deteriorated property and guard against the abuse of that power.

The LRHL outlines a careful process for the redevelopment of private property. First, the governing body of a municipality must "authorize the planning board to undertake a preliminary investigation to determine whether the proposed area" qualifies as a "redevelopment area" under the law. N.J.S.A. 40A:12A-6(a). The statute calls for notice and a public hearing in front of the planning board. N.J.S.A. 40A:12A-6(b)(2)-(3). After the hearing, the planning board must

14

recommend whether the area meets the statutory criteria for redevelopment. N.J.S.A. 40A:12A-6(b)(5)(a). The town's governing body, in turn, "may adopt a resolution determining that the delineated area, or any part thereof, is a redevelopment area." N.J.S.A. 40A:12A-6(b)(5)(b). That determination must be supported by substantial evidence in the record. N.J.S.A. 40A:12A-6(b)(5)(c).

Section 5 of the LRHL lies at the heart of the process. The section lists eight specific criteria. N.J.S.A. 40A:12A-5(a)-(h). For a municipality to designate an area "to be in need of redevelopment," town officials must first find that one of the delineated conditions exists.

The town's designation is pivotal to the takings process. Without it, the process stops in its tracks. See Gallenthin, supra, 191 N.J. at 348, 371 (noting that designation subjects private property to taking by eminent domain). If town officials decide that an area is in need of redevelopment, the governing body may go forward and adopt a redevelopment plan for the area. N.J.S.A. 40A:12A-7(a). The municipality can then "proceed with the clearance, replanning, development and redevelopment of the area designated in that plan." N.J.S.A. 40A:12A-8. In particular, the town can condemn and acquire private property under the Eminent Domain Act to carry out the

redevelopment plan.  N.J.S.A. 40A:12A-8(c) (citing N.J.S.A. 20:3-1 to -50).

B.

In 2007, this Court considered the constitutionality of the LRHL in Gallenthin.  The case centered around a sixty-three acre parcel of land in Paulsboro, most of which was undeveloped open space that the State Department of Environmental Protection had identified as protected wetlands.  Gallenthin, supra, 191 N.J. at 348-49.  Gallenthin Realty and George and Cindy Gallenthin (collectively, Gallenthin) owned the property.  Id. at 348. They sporadically used it as a "dredging depot" and leased parts of the land to an environmental clean-up organization.  Id. at 349.

The Borough of Paulsboro adopted a new master plan in 1998, which described the Gallenthin property as "idle" and encouraged the town to explore acquiring and redeveloping the property. Id. at 350.  The following year, the local planning board investigated whether several parcels -- not including the Gallenthin property -- could be designated as in need of redevelopment under the LRHL.  Ibid.  In 2002, the town added the Gallenthin property to the potential redevelopment site and asked an engineering firm to examine the parcel.  Id. at 351. The firm later reported that the land was "stagnant and not fully productive," and that it "underutiliz[ed]" a rail line on

16

the edge of the property.  Id. at 352.  As a result, the study concluded that the "existing conditions . . . satisfy the statutory criteria necessary to deem the study area an area in need of redevelopment."  Ibid.  After a public hearing, the planning board, relying on N.J.S.A. 40A:12A-5(e),[1] recommended

---

[1] At the time, section 5(e) of the LRHL provided that an area could be found to be in need of redevelopment if the governing body found

> [a] growing lack or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein or other conditions, resulting in a stagnant or not fully productive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare.
>
> [N.J.S.A. 40A:12A-5(e) (2007) (emphasis added).]

Following Gallenthin, the Legislature amended section 5(e). It now reads as follows:

> [a] growing lack or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real properties therein or other similar conditions which impede land assemblage or discourage the undertaking of improvements, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare, which condition is presumed to be having a negative social or economic impact or otherwise being detrimental to the safety, health, morals, or welfare of the surrounding area or the community in general.

17

that the Gallenthin property qualified for redevelopment, and the Borough adopted the recommendation.  Id. at 352-54.

Gallenthin challenged the designation and claimed that its property did not meet any of the criteria under the LRHL.  Id. at 354.  The trial court upheld Paulsboro's determination, and the Appellate Division affirmed that judgment.  Ibid.  This Court granted Gallenthin's petition for certification, which challenged the constitutionality of section 5(e) of the LRHL.

The Court reversed, and its decision followed a straightforward path.  As the Court explained, the appeal "requires us to ascertain the meaning of the term 'blighted' as used in the New Jersey Constitution, and determine whether . . . N.J.S.A. 40A:12A-5(e) is within the scope of that term."  Id. at 358 (emphasis added).  To decide the first question, the Court reviewed various definitions of the term "blight," considered scholarly articles that spanned sixty years, examined the record of the 1947 Constitutional Convention, and surveyed the statutes and case law of other states.  Id. at 360-62, 364-65.

The Court also examined the evolution of the term "blight" in New Jersey.  It noted that "in adopting the Blighted Areas Clause, the framers were concerned with addressing a particular phenomenon, namely, the deterioration of 'certain sections' of

[N.J.S.A. 40A:12A-5(e) (2015) (emphasis added)].

18

'older cities' that were causing an economic domino effect devastating surrounding properties." Id. at 361-62. The Court observed that, years later, the term "blight" expanded beyond "slum clearance" to include redevelopment plans in suburban and rural areas and "the acquisition of land in that context." Id. at 363 (referencing the Blighted Areas Act).

The Court concluded that "blight" has two components under the meaning of the State Constitution: (1) "deterioration or stagnation" (2) that "has a decadent effect on surrounding property." Id. at 365. To underscore its holding, the Court repeated it not once, not twice, but three times:

*"[T]he term presumes deterioration or stagnation that negatively affects surrounding areas," id. at 360;

*"Although the meaning of 'blight' has evolved, the term retains its essential characteristic: deterioration or stagnation that negatively affects surrounding properties," id. at 363; and

*"At its core, 'blight' includes deterioration or stagnation that has a decadent effect on surrounding property," id. at 365.

The Court placed no limit on its holding. It set out to define the meaning of blight under the New Jersey Constitution, not a subpart of a statute. And the Court expressly outlined a standard. Only after determining what "blight" meant under the

19

Constitution did the Court turn to its second question: whether subsection (e) complied with the constitutional standard. The Court found that Paulsboro's construction of the law did not. Id. at 365. The Court concluded that "Paulsboro's interpretation of N.J.S.A. 40A:12A-5(e), which would equate 'blighted areas' to areas that are not operated in an optimal manner, cannot be reconciled with the New Jersey Constitution." Ibid. And the Court explained why: because the meaning of the term "blight" under the Constitution "includes deterioration or stagnation that has a decadent effect on surrounding property." Ibid. Under Paulsboro's approach, by contrast, "any property that is operated in a less than optimal manner is arguably 'blighted.'" Ibid. The Court reasoned that "[i]f such an all-encompassing definition of 'blight' were adopted, most property in the State would be eligible for redevelopment." Ibid. Because Paulsboro's sole reason "for classifying the Gallenthin property as 'in need of redevelopment' was that the property, in isolation, was 'not fully productive,'" the Court ruled that the designation went "beyond the scope" of subsection 5(e) and invalidated the finding. Id. at 372.[2]

---

[2] To avoid rendering section 5(e) unconstitutional, the Court held that the clause only applied "to areas that, as a whole, are stagnant and unproductive because of issues of title, diversity of ownership, or other similar conditions." Id. at 348 (emphasis added). The Legislature revised the statute accordingly in 2013. L. 2013, c. 159, § 1.

20

*Gallenthin* teaches certain important lessons.  Whenever a town designates an area to be in need of redevelopment, the designation must satisfy the definition of blight under the Constitution.  As a result, if the Legislature passes a statute that allows for the taking of property on less than a showing of blight, as required by the Constitution and defined in *Gallenthin*, the statute cannot survive a challenge and the designation cannot stand.

The Appellate Division understood *Gallenthin* in that way. It acknowledged that the opinion only addressed one clause of the LRHL but highlighted the Court's approach:  that subsection 5(e) could not be "applied to cover property that is not blighted within the meaning of the Constitution."  Focusing on the Court's reasoning, the panel concluded that "*Gallenthin*'s holding applies to every subsection of N.J.S.A. 40A:12A-5." Another appellate panel made the following similar observation: *Gallenthin* "reaffirmed that the New Jersey Constitution requires a finding of actual blight before private property may be taken for purposes of redevelopment."  Hoagland v. City of Long Branch, 428 N.J. Super. 321, 324 (App. Div. 2012), certif. denied, 213 N.J. 388 (2013).

### C.

The majority, however, reads *Gallenthin* differently.  It essentially argues that *Gallenthin* could not have meant what it

said in light of the history of earlier legislative schemes, the meaning of the Blighted Areas Clause, and prior decisions of the Court in Wilson v. City of Long Branch, 27 N.J. 360 (1958), and Levin v. Township Committee of Bridgewater, 57 N.J. 506, appeal dismissed, 404 U.S. 803, 92 S. Ct. 58, 30 L. Ed. 2d 35 (1971). See ante at __-__ (slip op. at 17-25). A careful reading of the historical record and the case law, however, reveals that they did not address the meaning of the term "blighted" under the Constitution or foreclose Gallenthin's discussion of that issue.

The Blighted Areas Clause was adopted as part of the 1947 Constitution against the backdrop of two legislative schemes: the Redevelopment Companies Law, L. 1944, c. 169; and the Urban Redevelopment Law, L. 1946, c. 52. Both acts provided for public and private roles to redevelop decaying urban areas. Neither statute, though, defined the term "blighted." The 1944 law "declared" that "substandard conditions and [u]nsanitary housing conditions owing to obsolescence, deterioration and dilapidation of buildings, or excessive land coverage, lack of planning, of public facilities, of sufficient light, air and space, and improper design and arrangement of living quarters" exist in certain municipalities in New Jersey. L. 1944, c. 169, § 2. The 1946 act contained a similar declaration. L. 1946, c. 52, § 2 ("congested, dilapidated, substandard, unsanitary and dangerous housing conditions and excessive land coverage

22

existing in portions of the municipalities in this State are a menace to the health, safety, morals and welfare of the public, and constitute social and economic liabilities"). Both statutes outlined an approach to address the problem, but they did not identify specific criteria to determine when a parcel of private land could be considered "blighted" or "in need of redevelopment," as the BAA and LRHL later did.

Neither statute appears to have gotten much use. A witness at the constitutional convention explained that, "with the fear" that the laws might be "held unconstitutional hanging over their heads," "[n]o corporations have been willing, so far," to invest money to undertake the public/private projects envisioned. Proceedings of the New Jersey Constitutional Convention of 1947, vol. 1 at 743-44.

The Blighted Areas Clause, no doubt, was adopted to address that concern and signal that the new Constitution authorized legislation like the 1944 and 1946 acts. See McClintock v. City of Trenton, 47 N.J. 102, 105 (1966); see also James R. Zazzali & Jonathan L. Marshfield, Providing Meaningful Judicial Review of Municipal Redevelopment Designations: Redevelopment in New Jersey Before and After Gallenthin Realty Development, Inc. v. Borough of Paulsboro, 40 Rutgers L.J. 451, 474-75 (2009). The history of the constitutional convention shows that the framers validated an important concept: the new Constitution, in broad

terms, empowered government to redevelop and take blighted private property. But the framers did not analyze or validate each declaration and phrase in the 1944 and 1946 acts. Nor did they define the term "blighted."

The Legislature acted soon after, in 1949, and passed the Blighted Areas Act, the predecessor to the LRHL. L. 1949, c. 187. The new law defined "blighted area" in four subsections. The definition included, for example, "[b]uildings and structures which are unfit, unsanitary and unsafe for human use and habitation by reason of age, physical deterioration, dilapidation or obsolescence," id. at § 1(a), and "[a] prevalence of factors conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, crime and poverty," id. at § 1(d).

Two years later, in 1951, the Legislature amended the statute and broadened the definition of "blighted areas." L. 1951, c. 248, § 1. (The abbreviation "BAA" refers to this amended version of the Blighted Areas Act.) As the majority outlines, the definitions that appear at N.J.S.A. 40:55-21.1(a), (b), and (d) (repealed) of the BAA are nearly identical to their companion sections in the LRHL, at N.J.S.A. 40A:12A-5(a), (b), and (d). See ante __-__ (slip op at 20-21); see also Forbes v. Bd. of Trs. of S. Orange Vill., 312 N.J. Super. 519, 526 (App. Div.), certif. denied, 156 N.J. 411 (1998).

24

The Court addressed certain aspects of the constitutionality of the BAA in Wilson.  In that case, the Mayor and Board of Commissioners of the City of Long Branch adopted a recommendation of the planning board that declared an area of the city "blighted."  Wilson, supra, 27 N.J. at 368-69.  The City acted under the BAA.  Owners of the land challenged the designation and argued that the BAA was unconstitutional for various reasons.

Justice Francis's opinion offers a robust defense of the benefit of "[c]ommunity redevelopment."  Id. at 370-71.  The detailed opinion also outlines the specific bases for plaintiffs' constitutional challenge:  (1) the title of the BAA embraces three objects and thereby violated Article IV, section 7, paragraph 4 of the Constitution; (2) the BAA permits a taking of property without just compensation, in that a determination of blight alone diminishes the market value of property and thus constitutes a taking; (3) the State and Federal Constitutions conflict with the BAA because the law "permits the taking of property by the municipality for private use, namely, for development by private capital and for the pecuniary profit of private individuals"; (4) the act "discriminates against private property owners and in favor of public utilities"; (5) "the act contains no reasonable standards to guide a planning board or governing body in making a determination that an area is

25

blighted"; and (6) the authority to define the term "blighted," as used in the Blighted Areas Clause of the Constitution, "resides in the judicial and not the legislative branch of the government." Id. at 373-83. Against those particular challenges, Wilson upheld the constitutionality of the statute.

The first four bases for upholding the law against constitutional attack are of no relevance here. The fifth claim -- whether the BAA delegated unbridled discretion to towns -- also rested on explicit arguments that the Court addressed. The owners claimed that the act's delegation of power was unrestrained because (1) it did not contain "any limitation upon the size of the area which may be designated as blighted"; and (2) the act allowed for "the possibility that sound structures or even a portion of a municipality containing a number of such structures may be included." Id. at 379. In that particular context, Justice Francis stated that the five relevant criteria in the BAA "define 'blighted area' with substantial exactitude and confine[d] the municipal decision to those limits." Id. at 378. He therefore expressed "no hesitancy in finding [the criteria] to be a sufficient channeling of the local authority." Ibid. The opinion, however, did not attempt to define the term "blighted" or address whether the individual criteria in the BAA lived up the term's meaning under the Constitution.

The owners' sixth constitutional challenge -- whether the judiciary or the legislative branch had the authority to define "blighted" -- likewise does not relate to the questions the Court tackled in Gallenthin.

To be sure, Wilson upheld the BAA against constitutional challenge.  It did so in the context of the specific challenges leveled before the Court in that case, and it should be read in that context.  As Justice Francis's careful accounting of the parties' arguments reveals, though, the opinion did not squarely address the core question of the meaning of the term "blighted" under the Constitution.

The decision in Levin likewise did not directly consider that issue.  For the most part, the Court evaluated whether a declaration that certain land was "blighted" satisfied the statutory test of the BAA.  Levin, supra, 57 N.J. at 509.  It did not address constitutional concerns except for one minor issue.

The Levin Court debated whether the facts of the case justified the declaration under one subsection of the law.  Id. at 541.  A sharply divided Court found substantial evidence to support the finding.  Ibid.  In the last paragraph of the majority's opinion, Justice Francis, relying on Wilson, once again rejected a constitutional claim that the BAA "delegates unbridled legislative power to the municipal agencies" without

27

"adequate standards." Id. at 545. As before, that conclusion did not address or foreclose the issues raised in Gallenthin.

Gallenthin marked the first time the Court squarely focused on the meaning of the term "blighted" in the Constitution. See Zazzali & Marshfield, supra, at 491-92. The opinion did not need to parse Wilson or Levin, which had a different emphasis in response to different claims. Because neither decision embraced a particular definition of "blighted" under the Constitution, there was no need to "repudiate[]" those rulings, as the majority suggests. See ante at __ (slip op. at 28). Gallenthin thus stands as the guiding law for the constitutional meaning of "blighted."

Among other reasons, the majority suggests that Gallenthin's standard for "blight" -- "deterioration or stagnation that negatively affects surrounding properties," Gallenthin, supra, 191 N.J. at 363 -- was not meant to encompass parts of the LRHL beyond subsection (e) because the definition "does not describe every form of possible blight." Ante at __ (slip op. at 28). As proof, the majority offers hypotheticals that are hard to imagine. Id. at __-__ (slip op. at 28-29). Are there "isolated" deteriorating slums that do not affect surrounding properties? Don't truly decadent slums have a harmful effect on neighboring properties -- both developed and unimproved land -- and inhibit growth because of decay? Can it

28

really be said that a "toxic industrial site" has no effect on neighboring land? Gallenthin logically extends to both hypotheticals, and both would likely be able to satisfy its test for "blight."

Gallenthin established a clear standard for the meaning of blight in the Constitution, which prior case law not been required to address. By doing so, Gallenthin achieved another important aim: it helped guard against the real risk of abuse that the power of eminent domain presents. Justice Haneman's dissent in Levin gave voice to that concern. He wrote that "[g]overnment is here taking land from one owner by force and giving it to another, on terms that may not benefit the former but will of necessity benefit the latter. . . . In this aspect of the municipal relationship lies the inherent danger of an abuse of discretion." Levin, supra, 57 N.J. at 551 (Haneman, J., dissenting). The Justice added that "an individual without political connections runs the risk of having his property taken from him by force for the benefit of a better connected or more highly regarded individual." Id. at 552.

With today's reversal of Gallenthin's reach, that risk resurfaces.

### III.

This case focuses on three different parts of the LRHL: subsections 5(a), (b), and (d). Those sections, as well, should

be analyzed in light of the constitutional standard in

Gallenthin.  Section 5 provides in part as follows:

> A delineated area may be determined to be in need of redevelopment if, after investigation, notice and hearing as provided in [N.J.S.A. 40A:12A-6], the governing body of the municipality by resolution concludes that within the delineated area any of the following conditions is found:
>
> (a)    The generality of buildings are substandard, unsafe, dilapidated, or obsolescent, or possess any of such characteristics, or are so lacking in light, air, or space, as to be conducive to unwholesome living or working conditions.
>
> (b)    The discontinuance of the use of buildings previously used for commercial, manufacturing, or industrial purposes; the abandonment of such buildings; or the same being allowed to fall into so great a state of disrepair as to be untenantable.
>
> . . .
>
> (d)    Areas with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community.
>
> [N.J.S.A. 40A:12A-5 (emphasis added).]

None of the sections expressly requires a finding that a property suffers from deterioration or stagnation in a way that has a negative effect on surrounding properties.  In other words, none of the subsections expressly satisfies the

30

constitutional standard.  It is therefore necessary to ask whether the subsections _implicitly_ live up to the required two-part definition of blight through the way they describe various conditions of property.

Because the statute is written in the disjunctive, any combination of findings could justify the conclusion that a property is in need of redevelopment.  In other words, towns can pick from a menu of factors to reach that end.

Many of the phrases in subsection (a), if supported by substantial evidence in a record, could justify a finding of deterioration or stagnation.  But is that true for all of the factors?  Is "substandard" property deteriorating or stagnating in all cases?  Do all small properties that are "so lacking in . . . space . . . as to be conducive to unwholesome living" necessarily satisfy that requirement?  The above language does not even require that unwholesome conditions actually exist, only that the premises are "conducive" to that condition. Subsection (a) is also silent as to the second prong of the definition of blight -- a negative or decadent effect on surrounding properties -- which must also be satisfied.

The same concerns are true for subsections (b) and (d). Once again, many of the factors listed could support a finding of blight, but it is not clear that all necessarily would. Under subsection (b), for example, does "discontinuance of . . .

31

use," on its own, suffice to show blight in all cases?  Under subsection (d), does a "faulty arrangement or design" or "excessive land coverage" which is "detrimental to the . . . morals . . . of the community" necessarily establish deterioration or stagnation?  It is far from clear what that even means.  Other combinations of factors also invite troubling concerns and do not necessarily meet the standard of blight under the Constitution.

Only subsection (d) comes close to addressing the second prong that "blighted" encompasses -- a negative effect on surrounding properties.  The section states that the listed factors must be "detrimental to the safety, health, morals, or welfare of the community."  But not all of those disjunctive terms necessarily mean there is an actual negative effect on neighboring properties.

Gallenthin alleviated those concerns by defining "blighted" with care.  To satisfy the State Constitution, a town seeking to redevelop and ultimately take property under any section of N.J.S.A. 40A:12A-5 -- and not just subsection (e) -- must find that the property is deteriorating and stagnant in a way that negatively affects surrounding properties.  Construed in that fashion, the statute is saved both from possible overreaching and constitutional attack.

Gallenthin has led to clarity, not chaos.  See ante at (slip op. at 31-32).  There is no reason to expect otherwise by adhering to its holding.  The majority's narrow reading of Gallenthin, by contrast, leaves open the possibility of countless future challenges.  Even worse, officials of governing bodies will be empowered to proceed down the road toward taking private property on less than a meaningful showing of actual blight.  If and when that happens, the commands of the Constitution will go unmet.

IV.

In my judgment, this matter should be remanded to the Planning Board.  The Board should be allowed to reconsider its determination in light of the standard for blight in Gallenthin. In other words, the Planning Board should be asked to consider whether, in addition to the required findings under subsections (a), (b), or (d) of N.J.S.A. 40A:12A-5, the two properties are deteriorating or stagnant in a way that negatively affects surrounding properties.

The majority instead upholds the City's determination on the record before the Court.  A close look at the town's findings and the record, however, does not support the decision the town reached.

The majority cites at length to the redevelopment studies and addendum prepared by H2M.  To the extent they support

33

findings in the resolution of the Planning Board, which the

Mayor and City Council adopted, the studies are relevant --

provided they contain "substantial evidence" in support of the

town's determination.  N.J.S.A. 40a:12A-6(b)(5)(c).  But the

studies cannot serve as a substitute for the actual findings of

the Board and Council.  The Board and Council's findings must

themselves address and establish blight.

The proper starting point, then, is the limited set of

findings that Hackensack made.  The Planning Board resolution

found as follows:

> [As to 62-64 Main Street:]
>
> Based upon H2M Group's revised Redevelopment
> Study, dated May 15, 2007 and Addendum 1
> report dated September 27, 2007, Mr. Steck's
> Planning Evaluation dated August 21, 2007, and
> the testimony given at the hearings by Mr.
> Pessolano on December 13, 2006, Ms. Talley on
> September 27, 2007, and Mr. Steck on December
> 4, 2007, the Board found that Block 205, Lots
> 4 through 7 contains buildings which show
> prominent signs of structural deterioration,
> and is boarded up to prevent unauthorized
> access.  The code enforcement issued by the
> City to the property owner on March 10th,
> 2005, to demolish the buildings or correct
> unsafe conditions, places the property within
> criteria 'a' of the statute because the two
> buildings are substandard and unsafe for
> occupancy.  The property meets criteria 'b'
> because the two existing commercial buildings
> are vacant due to deteriorated conditions that
> have rendered them untenable [sic].  The
> parking area is unsightly and not well
> maintained.  The property also suffers from

34

faulty arrangement of design under criteria 'd'.[3]

[As to 59-61 Moore Street:]

Based upon H2M Group's revised Redevelopment Study, dated May 15, 2007 and Addendum 1 report dated September 27, 2007, Mr. Steck's Planning Evaluation dated August 21, 2007, and the testimony given at the hearings by Mr. Pessolano on December 13, 2006, and Ms. Talley on October 11, 2007 and November 8, 2007, the Board found that Block 205, Lot 8 meets criteria 'd' for faulty arrangement of design, which is indicated by the undefined layout and related poor circulation for the parking lot. The conditions have a negative impact on the surrounding properties because it is an unsightly area and the inefficient utilization of the parking area contributes to greater use of the on-street parking resources than would otherwise occur.

Based on those brief findings -- and nothing more -- the City

can now proceed down the road to take private property from its

---

[3] The majority repeats statements counsel made at oral argument -- that the roof to one of the buildings at 62-64 Main Street collapsed during this appeal, and the building was later torn down. See ante at __, __ (slip op. at 6 n.1, 38). That information does not belong in the opinion. It is not in the record and, of course, was not before the City when it reached its decision. A reviewing court evaluates the propriety of a resolution based on particular evidence at the time of the initial decision. See N.J.S.A. 40A:12A-6(b)(5)(c). Courts should not consider evidence outside the record that was not before a planning board -- whether the evidence strengthens or weakens the board's decision. In this case, ironically, the removal of one of the buildings makes the overall property safer.

This matter does not require the Court to consider whether the passage of time and changes to an area might warrant reconsideration of a town's redevelopment designation. See Zazzali & Marshfield, supra, at 499-500.

rightful owners because this Court's decision paves the way. I believe that the Constitution requires more.

"[A] presumption of validity" applies to a town's designation of blight. Levin, supra, 57 N.J. at 537. Its determination is entitled to deference if supported by "substantial evidence" in the record. See Gallenthin, supra, 191 N.J. at 372-73; N.J.S.A. 40A:12A-6(b)(5)(c).

Here, the sparse findings of the Board make only a passing reference to the Redevelopment Studies and Addendum and the testimony before the Planning Board. The Board's resolution mentions few concerns and highlights no particular areas of testimony. In addition, the resolution offers little by way of explanation. For the most part, it recites conclusory terms that mirror the statute: "substandard," "unsafe," "untenantable," "faulty arrangement of design," and the like. Gallenthin, supra, cautioned against that very practice: "[A] municipality must establish a record that contains more than a bland recitation of applicable statutory criteria and a declaration that those criteria are met." 191 N.J. at 373.

Beyond that, as the Appellate Division noted, it is "clear that neither the Board nor the Mayor and Council considered whether the conditions noted in the Board's resolution rose to the level of blight" under Gallenthin. The Board's findings,

adopted by the Mayor and City Council, are therefore insufficient.

The Board's findings for 62-64 Main Street do not address whether the property has a negative effect on the surrounding area. That issue cannot be left to inference and instead calls for "meaningful and quantitative evidence." Zazzali & Marshfield, supra, at 496. The public and the property's owners are entitled to a crisp determination on this vital question before government officials can designate private property as in need of redevelopment. That is particularly true when properties are not located in an area suffering from economic degradation. Here, both parcels are in a thriving, commercial area that is home to a newly built CVS, Auto Zone, and branch of TD Bank.

As to 59-61 Moore Street, the resolution points to a "faulty arrangement of design" because of the lot's "undefined layout" and "related poor circulation." The resolution then concludes -- in a single sentence -- that the parcel's conditions "have a negative impact on the surrounding properties" because the property is "unsightly" and has led to more "on-street parking . . . than would otherwise occur." Yet one of the City's experts conceded that no parking study had been done of the area. And the City's other expert conceded that with a few improvements -- some landscaping, striping, and

37

exterior lighting, to better define the boundary between the parking lot and the sidewalk -- the property would not qualify as an area in need of redevelopment under the statute.  The Board credited both experts.  Cf. ante at ___ (slip op. 37 n. 8).  It is difficult to see how those minor conditions, which can be easily remedied, can satisfy the constitutional definition of "blighted" and lead to the taking of private property.

At the core of the Board's conclusion is the very possibility that Gallenthin found unacceptable:  that private property might be redeveloped because it "is not used in an optimal manner."  Gallenthin, supra, 191 N.J. at 373.  That sort of conclusion cannot support a finding of blight under the Constitution.  Ibid.

The majority, focusing on the Moore Street parcel, suggests that even if the property does not meet the definition of blight, it might still be designated as part of an area in need of redevelopment because "[b]light determinations are not viewed in piecemeal fashion."  Ante at __ (slip op. at 40).  The suggestion, as Hackensack concedes, is premature.

Hackensack focused on whether the Main Street and Moore Street properties themselves qualify for redevelopment under the LRHL.  The Planning Board's resolution expressly states that because "no redevelopment plan has been proposed at this time,"

38

it would be "premature" to include properties "that do not otherwise meet the statutory criteria" as part of a redevelopment area.

There are other reasons for concern as well. The LRHL states that

> [a] redevelopment area may include lands, buildings, or improvements which of themselves are not detrimental to the public health, safety or welfare, but the inclusion of which is found <u>necessary</u>, with or without change in their condition, for the effective redevelopment of the area of which they are a part.
>
> [N.J.S.A. 40A:12A-3 (emphasis added).]

That section finds support in prior case law. <u>Wilson</u> recognized that a redevelopment area may "include[] some sound homes or buildings" and that a portion of the plan may "incorporate[]" structures that "are not substandard" "<u>as an integral part and necessary</u> to the accomplishment of the redevelopment plan." <u>Wilson</u>, <u>supra</u>, 27 <u>N.J.</u> at 379 (emphasis added). <u>Levin</u> similarly noted that the BAA was "concerned with areas and not with individual properties" and that single parcels that "could not be declared blighted if considered in isolation" might be included. <u>Levin</u>, <u>supra</u>, 57 <u>N.J.</u> at 539.

The Court in <u>Levin</u> made that observation while reviewing Bridgewater's designation of 122 acres of rural land as blighted. <u>Id.</u> at 515-16, 520. The area contained only eighteen

or nineteen structures throughout; most of the designated land was undeveloped.  Id. at 516.

This case presents a very different situation.  Hackensack plans to redevelop only five parcels of land that together comprise less than one acre (.797 acre).  The two properties in question -- 62-64 Main Street and 59-61 Moore Street -- are not contiguous to the other three parcels.  In fact, plaintiffs' properties are across the street from the other three parcels.  Also, plaintiffs' two properties comprise 42.4 percent of the total for all five parcels.  (A map of the area captures these points better than words can, and one is attached at Appendix A.)  If neither of plaintiffs' parcels qualify as areas in need of redevelopment under the statute, it is too early to predict whether they might be "necessary" and "integral" to the redevelopment of non-contiguous land, separated by a street, which is comparable in size.[4]  That question would require careful scrutiny.

The governing body here had the responsibility to ensure that its designation of property as "in need of redevelopment" satisfied the LRHL and the Constitution.  It did not do so.

_____

[4] The City's Resolution directs the Planning Board to investigate whether Bridge Street, which bisects the properties, should be "vacat[ed]."

40

To the majority, this is a "mundane scenario" in which local officials designated dilapidated, rundown properties in a downtown section of a city for redevelopment. Ante at __ (slip op. at 43). It is more than that. According to the record, the case involved owners of private property who spent hundreds of thousands of dollars to improve their land in recent years, leveled part of the buildings on the properties, and presented three different development plans to town officials -- at the very time the town moved ahead with its own plan to designate the area for redevelopment.

That information offers context; the legal question presented is even more important. Today, the Court permits privately owned property to be designated for redevelopment -- and ultimately for a taking -- even though local officials have not found that the land has a negative effect on surrounding properties. That approach marks a retreat from Gallenthin.

The majority supports its position with pro-development views. Id. at __-__ (slip op. at 31-32). The Court's responsibility, though, is to apply the law in accordance with the Constitution and protect the individual rights our Constitution guarantees. Those rights serve as an important check on the power of eminent domain and extend to residents, homeowners, and businesses that do not want to be removed from their property and community against their will.

41

To be sure, the redevelopment of deteriorated properties that cause actual harm to neighboring land can be of great value to a community. When local officials attempt to take private property for that purpose, however, they must first satisfy the commands of the Constitution. Among other things, they must make a meaningful showing of actual blight. Because that did not occur here, I respectfully dissent.

JUSTICE SOLOMON joins in this opinion.



PLAINTIFFS' PROPERTIES

OTHER DESIGNATED PROPERTIES

# REDEVELOPMENT SITES

City of Hackensack, Bergen County, New Jersey

May 15, 2007

Source: New Jersey Parcel Map

**APPENDIX A**

**P344a**
**MODIFIED**

1

SUPREME COURT OF NEW JERSEY

NO. _A-19/20_          SEPTEMBER TERM 2013

ON CERTIFICATION TO          Appellate Division, Superior Court
_____


62-64 MAIN STREET, L.L.C. and
59-61 MOORE STREET, L.L.C.,

    Plaintiffs-Respondents,

        v.

MAYOR AND COUNCIL OF THE CITY
OF HACKENSACK; PLANNING BOARD
OF THE CITY OF HACKENSACK,

    Defendants-Appellants.



DECIDED          March 23, 2015
_____
       Chief Justice Rabner          PRESIDING
_____
OPINION BY          Justice Albin
_____
CONCURRING/DISSENTING OPINIONS BY  _____
DISSENTING OPINION BY          Chief Justice Rabner
_____


| CHECKLIST | REVERSE | AFFIRM |
|---|---|---|
| CHIEF JUSTICE RABNER |  | X |
| JUSTICE LaVECCHIA | X |  |
| JUSTICE ALBIN | X |  |
| JUSTICE PATTERSON | ---------------------- | -------------------- |
| JUSTICE FERNANDEZ-VINA | X |  |
| JUSTICE SOLOMON |  | X |
| JUDGE CUFF (t/a) | ---------------------- | -------------------- |
| TOTALS | 3 | 2 |

1