**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4036-18T3

KEVIN MALANGA,

     Plaintiff-Appellant,

v.

TOWNSHIP OF WEST ORANGE,
TOWNSHIP OF WEST ORANGE
PLANNING BOARD, and
TOWNSHIP OF WEST ORANGE
TOWNSHIP COUNCIL,

     Defendants-Respondents,

and

WEST ORANGE OFFICE
EXECUTIVE PARK, LLC,

     Defendant/Intervenor-
     Respondent.

_____

Argued March 10, 2020 – Decided September 11, 2020

Before Judges Fisher, Accurso and Gilson.

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, Docket No. L-1137-18.

James M. Turteltaub argued the cause for appellant (Carlin & Ward, PC, attorneys; James M. Turteltaub, of counsel and on the briefs).

Richard D. Trenk and Kenneth D. McPherson III argued the cause for respondents Township of West Orange, Township of West Orange Township Council and Township of West Orange Planning Board (McManimon, Scotland & Baumann, LLC, and Kenneth D. McPherson III, attorneys; Richard D. Trenk and Patrick J. Dwyer, on the joint brief).

Robert S. Goldsmith argued the cause for intervenor-respondent West Orange Office Executive Park, LLC (Greenbaum, Rowe, Smith & Davis, LLP, attorneys, join in the brief of respondents Township of West Orange, Township of West Orange Township Council and Township of West Orange Planning Board).

PER CURIAM

Resident taxpayer plaintiff Kevin Malanga appeals from the dismissal of his complaint in lieu of prerogative writs challenging the Township of West Orange's designation of the Essex Green Shopping Center and the Executive Drive Office Park as a non-condemnation area in need of redevelopment pursuant to the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -73. Because the record lacks substantial evidence to support the finding, we reverse.

In September 2017, the West Orange Township Council adopted a resolution directing the Township's Planning Board to investigate and

2

determine whether the properties located on Executive Drive and Rooney Circle, five lots in Block 155, 40.02, 40.03, 41.02, 42.01-and 42.02, and all of Block 155.21, met the criteria of an area in need of redevelopment in N.J.S.A. 40A:12A-5. The following month, Paul Grygiel, the Board's consultant planner, submitted a report of his study of the area to the Planning Board.

In preparing his report, Mr. Grygiel surveyed the uses and conditions of the properties in the study area and nearby areas, including their ownership and occupancy. He also reviewed municipal records, including the municipal tax map and Township tax records; the existing zoning ordinance and map; the 2004 West Orange reexamination report and the 2010 Master Plan update. He researched office and retail markets in New Jersey and met with the owners and property manager of the shopping center and with the architect and property owner of the office park.

The area targeted for redevelopment consists of about seventy acres in the center of West Orange in the area of Prospect Avenue and Interstate 280, which Mr. Grygiel described as "developed with an office park and shopping center, both of which are characterized by outdated buildings and relatively high vacancy rates." According to Mr. Grygiel, the Essex Green shopping center, situated on more than thirty-five acres, was built in 1957, with its last

A-4036-18T3

major renovation undertaken in 1991, although he noted more recent improvements throughout the site, including a restaurant pad for TGI Fridays. Mr. Grygiel reported the occupancy rate at seventy-seven percent, with major tenants including Shop Rite, Sears Outlet, Total Wine, AMC Theaters and Panera Bread. Macy's had recently vacated, with its outlet store brand, Macy's Backstage, occupying some of its former space.

The shopping center was purchased by Clarion Partners, an investment firm with over $40 billion under management, for $97 million the year before. Based on his site visit and discussions with the property manager, Mr. Grygiel concluded the size and layout of many of the retail units "are long and awkwardly laid out," and are "outdated by today's retail standards." The property manager reported "the mechanical and HVAC systems in many of the vacant units are old and are in need of replacement." The property is serviced by a central loading dock with a network of underground tunnels with each retail unit having a basement to receive deliveries and store goods. There are no elevators from the basements to the retail floor, resulting in many tenants taking deliveries via the doors on the retail floor, creating potential conflicts with cars and pedestrians.

A-4036-18T3

Mr. Grygiel determined the central building was aged "and is close to being or could be considered actually functionally obsolete," and "the retail units in need of significant renovation." He concluded the retail units, "[i]n their unused state, . . . are detrimental to the public welfare, especially when considering municipal land use policies which are meant to encourage the updating and upkeep of existing commercial development in the Township." He opined the shopping center met the criteria for an area in need of redevelopment under N.J.S.A. 40A:12A-5(b) "due to its partially vacant condition and unfavorable prospects for re-tenanting," and under N.J.S.A. 40A:12A-5(d) based on "the odd configuration of the central shopping center building, overall dated aesthetic, impractical loading system, and unsuitable retail units" and "outdated layouts and designs."

The Executive Drive Office Park, a complex of four buildings across thirty-two acres was also under new ownership, having been purchased by intervenor West Orange Executive Park, LLC for approximately $14 million earlier in the year. Although all four buildings have frontage along the I-280 right of way, there is no access from the highway. Instead, access is provided by a private road, Executive Drive, essentially a spur of Rooney Circle, which winds through the office park providing access to all four buildings.

The office park was developed over more than a dozen years, with buildings going up in 1971, 1977, 1978 and 1984. Each building is serviced by a surface parking lot. Major tenants at the time of Mr. Grygiel's study included Lincoln Tech, GEICO and the Department of Homeland Security. The new owner's architect told Mr. Grygiel that the buildings are considered "Class C" office space. In his report, Mr. Grygiel wrote that "[a]s there is an oversupply of dated, suburban office buildings in New Jersey, there is no real market for Class C office space at this time, or in the foreseeable future." The new owner reported a vacancy rate of fifty-eight percent, which Mr. Grygiel reported was nearly double the vacancy rates of suburban office space in New Jersey.

Mr. Grygiel noted the buildings were "poorly placed" on the site, tucked in as they were behind the shopping center, with little visibility from Rooney Circle on the approach through the shopping center or from I-280 as landscaping screens the buildings from the highway. Mr. Grygiel noted that "[m]odern office users are seeking open, daylighted spaces with multiple amenities" on site, and the only amenity on this site was a small, dated cafeteria. He found the buildings had dated facades and interiors that were in

6

only fair condition, and that updating "the outdated mechanical, electrical and plumbing systems would take a significant amount of investment."

Mr. Grygiel concluded the office park properties qualified as an area in need of redevelopment under criteria (b) of the Redevelopment Act "due to the partially vacant condition and unfavorable prospects of re-tenanting" based on the office park's "inferior location," its odd, outdated layout, dearth of natural light and lack of on-sight amenities. He also found the "obsolescent location" and layout of the office park provided "little or no options" for upgrades, qualifying the office park for a redevelopment designation under criteria (d) of the Redevelopment Act.

The Planning Board held two nights of public hearings on the proposed designation in accordance with N.J.S.A. 40A:12A-6. Mr. Grygiel was the only witness. After he summarized his findings, Board members and members of the public put questions to him. There were a number of objectors, with many directing questions and comments to the wisdom of the Town offering redevelopment incentives to the well-capitalized new owners of these properties, instead of leaving to them the costs of upgrading their investments. Both the Board chair and Mr. Grygiel repeatedly attempted to explain that the only issue before the Planning Board was whether the preliminary

7

investigation undertaken by Mr. Grygiel allowed the Board to conclude that the properties met the statutory criteria for an area in need of redevelopment under section 5 of the Redevelopment Act.

Notwithstanding the general objections voiced by many members of the public, there were some relevant questions put to the planner. In response to several questions about occupancy of the shopping center and the office park, Mr. Grygiel stated the owners provided him the information about the vacancy rates, and that he did not review the leases himself. After several members of the public and at least one member of the Board expressed the desire to have the owners appear before the Planning Board to address the vacancy rates at their properties, the planner said he would speak to the owners about having a representative who could testify about such matters appear at the next hearing.

At the second hearing, Mr. Grygiel reported he contacted the representatives of the owners that had appeared before the Town Council when it voted to approve the resolution authorizing his firm to undertake the preliminary investigation of whether the area qualified for redevelopment, who declined to appear before the Planning Board. He also testified that viewing the empty storefronts at the shopping center allowed him to confirm the 23.5 percent vacancy rate reported by management of the shopping center was

likely accurate. Although he could not similarly verify the vacancy rate at the office park, he was able to say based on the number of cars he saw in the parking lots and by viewing the building directories and walking some common areas that the complex was not nearly fully occupied. Mr. Grygiel testified in response to questions from the public that he could not say how long the vacancies at either the shopping center of the office park had persisted. He testified in response to questions about "discontinuance of use" that none of the buildings in the study area was "100 percent vacant."

Mr. Grygiel also responded to questions from members of the Board and the public at both hearings about the condition of the properties in relation to the statutory criteria, and specifically the requirement in section 5(d) of the Redevelopment Law that conditions be "detrimental to the safety, health, morals, or welfare of the community." Plaintiff asked Mr. Grygiel to "point out" where in the report he had concluded that the conditions of the property were "detrimental to the safety, health, morals, or welfare of the community." Mr. Grygiel responded:

> Well, it talks — the report talks generally about the Township's planning objectives and it's a — for this particular section of the town, that the intention is for being an economic driver to have — to be occupied essentially. And that if the current conditions persist and vacancy continues, that it will no longer be

9

serving that purpose. That's detrimental to the general welfare of the Township.

Plaintiff followed up, asking, "At the moment, is it detrimental to the safety, health, morals or welfare of the community, not ten years in the future, right now?" Mr. Grygiel responded: "Currently, I don't believe so." Plaintiff asked Mr. Grygiel again about this at the next hearing. After getting the planner to again agree the conditions he found, such as "obsolete layout" must be detrimental to the safety, health, morals or welfare of the community in order to qualify for redevelopment under section 5(d), plaintiff asserted the planner had nowhere explained "how that's the case." Mr. Grygiel responded:

> What I've talked about are the broader trends in office and retail and how these properties, <u>if they go down the current road</u>, are going to be, again, more obsolete and this is an important part of the Township that it should be — the Township should be proactive about the planning.
>
> [Emphasis added.]

Following the hearing, the Planning Board voted six to one in favor of recommending the designation. It subsequently adopted a one-page resolution stating only that the Board had received Mr. Grygiel's report, that the report concluded that the shopping center and office park "qualified for redevelopment designation under either criteria 'b' or 'd'" of section 5 of the

Redevelopment Law, and that "the Board hereby agrees with the conclusion of the Redevelopment Study" conducted by Mr. Grygiel that the properties "qualify as an 'area in need of redevelopment' in accordance with N.J.S.A. 40A:12A."[1] The Township Council subsequently voted to accept the Planning Board's recommendation, likewise not detailing the basis for the finding beyond stating that the Planning Board, "after completing its investigation and public hearing . . . concluded that there was sufficient credible evidence to support findings that satisfy the criteria" in section 5 of the Redevelopment Law.

Plaintiff timely filed this action in lieu of prerogative writs and the trial court granted the motion to intervene by the owner of the office park. After hearing argument, the court issued a written decision dismissing the complaint. The court found the Redevelopment Law "specifically allows for redevelopment of an area due to obsolescence, faulty arrangement or design, lack of ventilation and light, obsolete layout, or a combination" of them, and that Mr. Grygiel found evidence of those factors for both properties. The court

---

[1] See 62-64 Main St., L.L.C. v. Mayor & Council of City of Hackensack, 221 N.J. 129, 157 (2015) (noting a resolution that fails to "clearly articulate the factual findings that support the statutory criteria for designating an area as in need of redevelopment. . . . disserves the municipality and the parties").

A-4036-18T3

noted that the objectors did not introduce any evidence at the hearing, leaving Mr. Grygiel's opinion as the only evidence in the record. The court found the Planning Board and Council "[a]fter proper legislative procedures, . . . accepted [the planner's] recommendations that the facts set forth above are detrimental to the safety, health, morals, or welfare to the community."

Finding the designation "supported by substantial evidence in the record," the court found itself "bound to affirm that determination." Having concluded the Town satisfied the criteria under section 5(d) of the statute that the shopping center and office park were in need of redevelopment, the court concluded in did not need to address whether the criteria under 5(b) were also satisfied.

We review a trial court's decision sustaining or setting aside a municipality's decision that an area is in need of redevelopment using the same standard that governs the trial court. Levin v. Twp. Comm. of Bridgewater, 57 N.J. 506, 537 (1971). We are to approach review of a municipality's blight determination "with an acute awareness of the salutary social and economic policy which prompted the various slum clearance and redevelopment statutes." Ibid.

Although "remind[ing] planning boards and governing bodies that they have an obligation to rigorously comply with the statutory criteria for determining whether an area is in need of redevelopment," 62-64 Main St., 221 N.J. at 156, our Supreme Court regularly reminds us that "after the municipal authorities have rendered a decision that an area is in need of redevelopment, that decision is 'invested with a presumption of validity.'" Id. at 157 (quoting Levin, 57 N.J. at 537). In order to effectuate "the salutary social and economic policy" that animates the Redevelopment Law, the Court has instructed that we are "to interpret the powers granted to the local planning board liberally and to accept its exercise of the powers so long as a necessarily indulgent judicial eye finds a reasonable basis, i.e., substantial evidence, to support the action taken." Levin, 57 N.J. at 537.

At the time this case was decided in the trial court, the relevant portions of section 5 of the Redevelopment Law read as follows:

> A delineated area may be determined to be in need of redevelopment if, after investigation, notice and hearing as provided in section 6 of P.L.1992, c. 79 (C.40A:12A-6), the governing body of the municipality by resolution concludes that within the delineated area any of the following conditions is found:
>
> b. The discontinuance of the use of buildings previously used for commercial, manufacturing, or

industrial purposes; the abandonment of such buildings; or the same being allowed to fall into so great a state of disrepair as to be untenantable.

d. Areas with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community.

[N.J.S.A. 40A:12A-5(b) and (d).]

Having synopsized the key testimony underlying the Planning Board's finding that the shopping center and office park comprised an area in need of redevelopment, we think it plain that even viewing the finding with the most indulgent of judicial eyes that it cannot stand. The problem is that Mr. Grygiel, while cataloging the dated design, layout and mechanical systems of these properties under section 5(d), could not opine that any of those factors, singly or in combination, were "detrimental to the safety, health, morals, or welfare of the community" at the present time.

The report Mr. Grygiel authored states as to both the shopping center and the office park only that each "qualifie[d] under criteria 'd' due to their obsolete layout and faulty arrangement and design." The report does not explain how the flaws described affected the community's safety, health,

A-4036-18T3

morals or welfare. When asked point blank at the first night of hearings whether those conditions were detrimental to safety, health, morals or welfare, right now, "not ten years in the future," Mr. Grygiel replied: "Currently, I don't believe so." That was an admission that neither the municipal bodies nor the trial court was free to ignore.

The most Mr. Grygiel could offer was that his "report talks generally about the Township's planning objectives . . . for this particular section of the town," specifically the 2004 Reexamination Report's encouragement of development that "generates employment opportunities and beneficial commercial/retail activity." He asserted that for the properties to serve as intended in the Master Plan as "an economic driver" they need "to be occupied essentially. And that if the current conditions persist and vacancy continues, that it will no longer be serving that purpose." Mr. Grygiel concluded "[T]hat's detrimental to the general welfare of the Township."

We, of course, accept that a commercial area could be found in need of redevelopment based not only on "economic deterioration in tax revenue terms" but also based on "the adverse physical conditions of property that individually or in combination impeded its reasonable productivity and resulted in its negative impact upon the general welfare and economic well-

15

being of the community." Forbes v. Bd. of Trs. of S. Orange Vill., 312 N.J. Super. 519, 525 (App. Div. 1998). We said so in Forbes and repeated it in Concerned Citizens of Princeton, Inc. v. Mayor & Council of Princeton, 370 N.J. Super. 429, 458-59 (App. Div. 2004).

The Redevelopment Law under section 5(d), however, requires a finding that the conditions specified "are detrimental to the safety, health, morals, or welfare of the community," not that they will become so at some unspecified point in the future. See ERETC, L.L.C. v. City of Perth Amboy, 381 N.J. Super. 268, 279 (App. Div. 2005) (holding dilapidation insufficient to designate an area in need of redevelopment without detriment to the safety, health, morals or welfare). A desire to engage in "proactive planning" does not permit a municipality to designate an area in need of redevelopment in anticipation that conditions will cause it to become a detriment to the community in the future. See 99 Cents Only Stores v. Lancaster Redevelopment Agency, 237 F. Supp. 2d 1123 (C.D. Cal. 2001), dismissed, 60 Fed. Appx. 123 (9th Cir. 2003) (notion of avoiding future blight was entirely speculative and wholly without support under California's Community Redevelopment Law (CRL), and thus city's efforts to condemn retailer's property due to concern regarding future blight would violate public use

clause); cf. Gallenthin Realty Dev., Inc. v. Borough of Paulsboro, 191 N.J. 344, 365 (2007) (noting definition of "blight" could not be so broad as to make "most property in the State . . . eligible for redevelopment").

"[P]lanning boards and governing bodies . . . have an obligation to rigorously comply with the statutory criteria for determining whether an area is in need of redevelopment." 62-64 Main Street, 221 N.J. at 156. Because Mr. Grygiel was unable to offer the opinion that the obsolete layout and faulty arrangement and design of the shopping center and the office park was currently detrimental to the general welfare of the community, the record lacked substantial evidence to support the Planning Board's finding, adopted by the Township Council, that the properties were in need of redevelopment under section 5(d).

Although the trial court did not reach the Planning Board's determination that the finding could also be supported under section 5(b), we are satisfied that section, as it existed at the time of the decision, is of no avail to the Township. Before its recent amendment, section 5(b) provided that a delineated area could be found to be in need of redevelopment if,

> b. The discontinuance of the use of buildings previously used for commercial, manufacturing, or industrial purposes; the abandonment of such

A-4036-18T3

buildings; or the same being allowed to fall into so great a state of disrepair as to be untenantable.

[N.J.S.A. 40A:12A-5(b).]

Mr. Grygiel admitted that neither the shopping center nor office park had been abandoned or permitted to fall into such disrepair as to be untenantable. He contended, however, that the tenant vacancies in the shopping center and office park could constitute "[t]he discontinuance of the use of buildings previously used for commercial . . . purposes." We disagree, because the planner admitted that all of the buildings in both the shopping center and the office park continued to be used, none was vacant. See Gallenthin, 191 N.J. at 365 (noting a "statute's plain language is the most reliable indicium" of the Legislature's intent).

Our reading of the plain meaning of "discontinuance of use" is buttressed by the Legislature's recent amendment of section 5(b) to add the underlined language.

> b. The discontinuance of the use of a building or buildings previously used for commercial, retail, shopping malls or plazas, office parks, manufacturing, or industrial purposes; the abandonment of such building or buildings; significant vacancies of such building or buildings for at least two consecutive years; or the same being allowed to fall into so great a state of disrepair as to be untenantable.

[L. 2019, c. 229, § 1, eff. Aug. 9, 2019; N.J.S.A. 40A:12A-5(b).]

If discontinuance of use could encompass a building still in use although suffering significant vacancies, there would appear no need for the amendment. See Kasper v. Bd. of Trs. of the Teachers' Pension & Annuity Fund, 164 N.J. 564, 577 (2000) (noting the presumption that a change evidences "a departure from the old law," is strongest when the Legislature does not overhaul the entire statute but enacts only "an isolated independent amendment"). A committee statement to the bill provided it would

> allow municipalities to use the powers authorized under Article VIII, Section III, paragraph 1 of the State Constitution to redevelop these "stranded assets."[2] By specifying that a vacant shopping mall or office park is an area in need of redevelopment, a municipality can offer potential private sector partners redevelopment tools such as tax exemptions and abatements to encourage them to repurpose these stranded assets.
>
> [Assembly Commerce and Econ. Dev. Comm. Statement with Comm. Amendments to A. 1700 (L. 2019, c. 229) (Sept. 13, 2018).]

---

[2] Sponsor's Statement to A. 1700 (L. 2019, c. 229) ("[L]arge corporate office parks and large shopping malls have become obsolete, vacant, and difficult to market, today they are characterized in development circles as "stranded assets.").

Thus, it appears that the Legislature, by expanding the criteria of section 5(b), has addressed precisely the issues identified by Mr. Grygiel in his report to the Planning Board about the oversupply of "dated, suburban office buildings" and the inability of the shopping center to effectively compete, despite its key location in the Township, because it "does not comport with modern retail standards." Defendants have not asked that we decide this appeal under the current statute by resorting to the time of decision rule. See R. Neumann & Co. v. City of Hoboken, 437 N.J. Super. 384, 395 (App. Div. 2014) (applying 2013 amendments to the Redevelopment Law effective after the designation of an area in need of rehabilitation to the issues on appeal); see also Cox & Koenig, New Jersey Zoning and Land Use Administration §19-3.5 (2020) (noting the time of application rule, N.J.S.A. 40:55D-10.5 applies only to municipal ordinances). Even were we to do so, however, the result would be unchanged.

Although it appears likely that the study area might well qualify for designation as an area in need of redevelopment under the 2019 amendment to the Redevelopment Law, the absence of any information in the record about how long the vacancies in either the shopping center or the office park had persisted would prevent us from applying the current version of section 5(b) to

20

affirm the trial court's decision upholding the designation.  Accordingly, we invalidate the designation of the area as one in need of redevelopment and reverse the April 5, 2019 order that upheld it.

    Reversed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4036-18T3